PREMIER ELECTRICAL CONSTRUCTION COMPANY, Plaintiff-Appellant, *v.* RAGNAR BENSON, INC., Defendant-Appellee.

First District (4th Division)   No. 81—1852

Opinion filed December 30, 1982.

Patrick J. Mazza, of Chicago (Patrick Mazza & Associates, P.C., of counsel), for appellant.

Fischel & Kahn, of Chicago (Dan Brusslan, Paul D. Streicher, and Terrie A. Rymer, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Premier Electrical Construction Company (Premier), an electrical subcontractor, filed a three-count complaint against Ragnar Benson, Inc. (Benson), a general contractor, in the circuit court of Cook County. The complaint charged Benson with wrongfully rejecting claims made by Premier for additional payment to cover costs not

included in the contract between the two parties. In response, Benson moved to dismiss Premier's complaint on the ground that paragraph 14 of the same contract precluded litigation of claims by providing alternate dispute-resolving mechanisms to settle disagreements arising under the contract. After reviewing the pleadings and the contract and hearing oral argument, the trial court decided that it had no jurisdiction over the matter and therefore dismissed Premier's complaint with prejudice. Premier appeals, claiming that (1) the trial court erred in holding that all three counts of Premier's complaint were to be resolved according to the dispute-resolution procedures specified in the contract, and (2) paragraph 14 of the agreement is so vague that Premier should not be held to the methods of resolving disputes provided by that paragraph.

We find that the one count of Premier's complaint dealing with substituted construction materials is not covered by the contractual provisions for dispute resolution, and we therefore reverse the trial court's dismissal of that count. We affirm the trial court's ruling on the remaining two counts.

BACKGROUND

The record discloses that Benson was the general contractor for the construction of an addition to the Chicago Stamping Plant of Ford Motor Company. In order to prepare its own bid, Benson had distributed to various subcontractors the construction drawings and specifications provided by Ford. After Benson reviewed the bids, selected Premier as the electrical subcontractor, and in turn was awarded the general contract, the two parties signed a subcontract containing the following clauses pertinent to the instant litigation:

"A. SUBCONTRACTOR [Premier] AGREES:

1. That he has examined the General Contract, all plans, drawings and specifications prepared by the Owner [Ford] ***, for the entire work, *** and that he and his subcontractors will be and are bound by any and all parts of said plans, drawings, specifications and General Contract insofar as they relate *** to the work undertaken herein, and shall be further bound to the General and Special Conditions of the Specifications, also that he has thoroughly familiarized himself with *** all other matters and conditions which will affect the operations and completion of said work and he assumes all risks therefrom.

2. To furnish and pay for all labor, material, tools, supplies, equipment *** necessary to construct and complete in a

workmanlike manner all the work included in this Agreement ***.

***

13. Contractor [Benson] *** may order additions, omissions or alterations to or in the said work, materials or equipment, but no such changes shall be made except by a written order *** in which the additional amount to be paid *** or to be deducted from said contract price *** shall be stated.

14. All disputes concerning questions of fact, arising under the Agreement, shall be decided by the Contractor subject to written appeal by the Subcontractor within seven (7) days to the Contractor, who in turn will submit said appeal to the Owner [Ford] or his representative, whose decision shall be final and conclusive upon the parties thereto. In the event the Owner or its representative does not have jurisdiction over any such disputes, settlement of disputes shall be in accordance with the Standard Form of Arbitration Procedure as used by the American Institute of Architects. In the meantime, the Subcontractor shall diligently proceed with the work as directed.

***

21. To assume all risk and liability for loss or damage to the Subcontractor's material tools or equipment not incorporated in the work due to Subcontractor's negligence."

In addition, section 30—A of the General Conditions, mentioned in paragraph 1 of the subcontract, states,

"The Owner shall assume the risk of loss of or damage to all work performed and materials delivered to the site whether or not installed *** caused by fire, extended covered perils, vandalism, malicious mischief, and the contractor shall in no event be liable for any such loss or damage."

During the course of construction, Premier notified Benson of three claims for additional payment. First, Premier requested $18,458.48 as reimbursement for electrical materials that allegedly had been stolen from the jobsite after delivery. Second, Premier requested additional payment for the installation of certain ceiling fixtures because its bid had been based in part on the assumption that an overhead traveling crane depicted in the construction drawings would be available for Premier's use. The unusually high ceiling precluded the use of ordinary scaffolding, so when the overhead crane

was not installed and available as anticipated, Premier was forced to incur additional expenses of $11,000 for a boom truck and operator, an additional ground man, and the additional hours of labor. Third, Premier billed Benson for $4,303.30 to cover the additional cost of supplying at Benson's direction a higher-priced brand of bus duct than the one Premier had used in calculating its original bid.

Benson, pursuant to paragraph 14 quoted above, submitted the three claims to Ford "for your review and consideration." Ford replied by rejecting all three claims for compensation, and Benson so informed Premier. Following receipt of Ford's decision, Premier filed suit against Benson to collect the sums allegedly due on all three claims. Benson responded by filing a motion to dismiss pursuant to section 48 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 48) on the ground that paragraph 14 of the subcontract precluded Premier's recourse to the courts to resolve disputes arising under the contract. The trial court agreed and granted the motion to dismiss, concluding,

> "What the contract says is a question of law for the court to decide unless it is ambiguous and requires extrinsic evidence. I hold that this clause is—at least as to counts two and three—and I haven't arrived at an opinion yet as to count one—is unambiguous and contemplates that the questions—that disputes concerning questions of fact arising under this agreement—and I hold that extra work is one of those—are to be submitted to the contractor and thereafter to the owner; and the owner or his representative's decision shall be final and conclusive.
>
> * * *
>
> As to the count for the stolen property, * * * the agreement goes on to say that if the owner does not have jurisdiction over these disputes, they will be settled according to the Standard Form of Arbitration. Therefore, the Court will dismiss the complaint with prejudice in that the parties have agreed to dispose of their claims either by an owner's exclusive decision as to whether they are meritorious or not or by arbitration."

OPINION

The specific contract clause at issue, paragraph 14, required that Premier submit "all disputes concerning questions of fact arising under this Agreement" to Benson, with provision for a subsequent written appeal through Benson to Ford, whose decision was final. Only when Ford had no "jurisdiction" over a given dispute might a party request arbitration. Our initial step, therefore, must be to determine whether or not each of the individual claims for reimbursement in

Premier's complaint fell within the intended scope of the dispute-resolution provision.

Fundamental to a proper review of the trial court's holding and the arguments of the parties on appeal is a clear understanding of the posture of the case. Benson successfully based its motion to dismiss on the theory that the dispute-resolution clause at issue totally withdrew jurisdiction over contractual disagreements from the trial court in favor of final decisions by the owner or through arbitration. Section 1 of the Uniform Arbitration Act (Ill. Rev. Stat. 1979, ch. 10, par. 101) establishes that such arbitration agreements are valid, generally irrevocable, and enforceable. However, Benson now argues that this court lacks jurisdiction to hear Premier's appeal on the authority of precedent cases holding that the scope of the arbitration provision of a dispute resolution clause is to be determined in the first instance by the arbitrator, subject to review by the court and possible vacating of the arbitrator's award. (*Stuart-Dean Co. v. Lurie* (1979), 69 Ill. App. 3d 844, 388 N.E.2d 118; *School District No. 46 v. A.J. Del Bianco* (1966), 68 Ill. App. 2d 145, 215 N.E.2d 25; Ill. Rev. Stat. 1979, ch. 10, par. 112.) We find that Benson's argument misconstrues the interrelationships of the various provisions of the Uniform Arbitration Act and their application to the instant case.

Section 1 of the Act, which establishes the validity of a written arbitration agreement, has been interpreted to mean that the existence of an arbitration agreement in a contract automatically incorporates the entire Uniform Arbitration Act into the agreement. (*Ramonas v. Kerelis* (1968), 102 Ill. App. 2d 262, 243 N.E.2d 711.) Section 2(a) of the Uniform Arbitration Act specifies,

> "On application of a party showing [a written arbitration] agreement ***, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied." Ill. Rev. Stat. 1979, ch. 10, par. 102(a).

Nowhere in the record do we find any application for arbitration made by either party; further, under paragraph 14, the parties agreed to submit to arbitration only questions of fact, not all questions of contract interpretation. As stated in *United Steelworkers of America v. American Manufacturing Co.* (1960), 363 U.S. 564, 570-71, 4 L. Ed. 2d 1403, 1433, 80 S. Ct. 1343, 1364 (Brennan, J., concurring) in the context of an even stronger arbitration clause in a collective bar-

gaining agreement,

> "[S]ince arbitration is a creature of contract, a court must always inquire, when a party seeks to invoke its aid to force a reluctant party to the arbitration table, whether the parties have agreed to arbitrate the particular dispute. In this sense, the question of whether a dispute is 'arbitrable' is inescapably for the court."

Consequently, we find that our review of the trial court's granting Benson's motion to dismiss necessarily includes an examination of the arbitrability of the claims in Premier's complaint.

Although both Benson and Premier attempt to define the scope of paragraph 14 by drawing upon judicial interpretations of arbitration clauses from several earlier cases, we note that no example specifically matches the language of the clause in the instant case. Benson would have us conclude that decisions interpreting contract clauses requiring arbitration of "all disputes arising in connection with this contract" (*Silver Cross Hospital v. S. N. Nielsen Co.* (1972), 8 Ill. App. 3d 1000, 1001, 291 N.E.2d 247, 248; *Harrison F. Blades, Inc. v. Jarman Memorial Hospital Building Fund, Inc.* (1969), 109 Ill. App. 2d 224, 228, 248 N.E.2d 289, 291) are dispositive of the instant case and that the trial judge correctly ruled that he had no jurisdiction over any of the issues. On the other hand, Premier would have us emasculate the dispute resolution provision altogether by holding that the generality of its language subjects none of Premier's claims to arbitration because they are requests for payment, not disputes of fact arising under the contract. "Whether or not and what they arbitrate must be stated *** in crystal clear language unextended and unenlarged either by construction or by implication." *Harrison F. Blades, Inc. v. Jarman Memorial Hospital Building Fund, Inc.* (1969), 109 Ill. App. 2d 224, 226, 248 N.E.2d 289, 290.

■ We find neither position persuasive. Just as the provision is not one that specifies particular issues subject to arbitration (*Flood v. Country Mutual Insurance Co.* (1968), 41 Ill. 2d 91, 242 N.E.2d 149), neither is it a totally generic clause encompassing "all disputes arising in connection with this contract" (*Silver Cross Hospital v. S. N. Nielsen Co.* (1972), 8 Ill. App. 3d 1000, 1001, 291 N.E.2d 247, 248). Instead, the arbitrable disputes are limited carefully to those concerning "questions of fact." Further, the requirement quoted above that "crystal clear language" be used to define the particular issues to be arbitrated applies "not to the generic arbitration provision itself, but rather to the underlying contractual undertaking." (*Roosevelt University v. Mayfair Construction Co.* (1975), 28 Ill. App. 3d 1045, 1053,

331 N.E.2d 835, 841.) Premier may not restrict the entire focus of this inquiry solely to the arbitration provision. If, as here, the parties agreed to forego recourse to the courts while resolving "disputes concerning questions of fact arising under this Agreement," the agreement includes all the provisions of the contract including the plans, drawings, and specifications. (See *Intaglio Service Corp. v. J. L. Williams & Co.* (1981), 95 Ill. App. 3d 708, 420 N.E.2d 634.) We find, therefore, that proper resolution of the instant case requires that we look to the terms of the contract to see whether the disputes both "concern questions of fact" and "arise under the agreement."

## I

Premier's first claim is for additional compensation to cover the cost of replacing materials stolen from the jobsite. Although Ford refused to reimburse Premier, we note that the previously quoted provision, section 30—A of the General Conditions of the Specifications, incorporated by reference into the subcontract, specifically places on the owner the risk of loss of materials delivered to the site. On the other hand, paragraph 21 of the subcontract, also quoted above, appears to place that same risk of loss on Premier. "In construing the Contract Documents as a whole, provisions which seem to be in conflict should be reconciled if possible." (*Roosevelt University v. Mayfair Construction Co.* (1975), 28 Ill. App. 3d 1045, 1059, 331 N.E.2d 835, 846.) In fact, the two clauses are not contradictory. Whereas Premier must bear the risk if the loss is due to its own negligence, it appears clear to us that absent such negligence, Ford as owner bears the risk of loss.

■ Whether Premier acted negligently is clearly a question of fact; which party should bear the risk of loss is therefore a dispute concerning a question of fact arising under the agreement. Because Ford cannot be the judge of its own liability, it can have no jurisdiction over the issue of risk of loss for stolen material. Consequently, we find that on the issue of the stolen material, the trial court correctly decided that arbitration was the appropriate method of dispute resolution.

## II

The second count in Premier's complaint requested reimbursement for the additional expense of installing ceiling fixtures by using a boom truck instead of the overhead traveling crane depicted in the construction drawings. The trial court, designating this an expense for "extra work," held that a claim of extra work was a dispute con-

cerning a question of fact arising under the agreement and therefore was to be submitted first to Benson, then to Ford, with Ford's decision being final. While we do not regard this to be a claim for extra work as contemplated by paragraph 13 quoted above, we do find it to be covered by the provisions of paragraph 2 and therefore of paragraph 14. We agree with the trial court's conclusion that this claim for reimbursement was a decision over which Ford had jurisdiction and thus the contractual right to make the final determination.

Nowhere in the record does Premier ever assert that the overhead crane should have been available for its use. Premier merely states that had ordinary construction procedures been followed, the crane would have been completed and installed before the time came for Premier to install the ceiling fixtures. In correspondence included in the record, Ford correctly points out that certain general conditions included in the contract specify that Ford will not be liable for additional costs attributable to scheduling changes. Further, Premier never attempted to make any arrangements with Ford to use the overhead crane.

■ Under paragraph 1 of the the subcontract, Premier agreed to "familiarize [itself] with *** all other matters and conditions which will affect the operation and completion of said work and he assumes all risks therefrom." Under paragraph 2, Premier agreed to furnish all "labor, material, tools, supplies, equipment *** necessary to construct and complete *** all the work included in this Agreement." We agree with the trial court that the issue of the traveling crane is one of fact arising under both paragraphs quoted above. Under the terms of paragraph 14, Ford as owner exercised its final authority to decide such an issue. A court may not rewrite a contract "simply to reach what may appear to be a more equitable result when the contract is an unambiguous expression of the entire agreement." (*Touhy v. Twentieth Century-Fox Film Corp.* (1979), 69 Ill. App. 3d 508, 513, 387 N.E.2d 862, 866.) Accordingly, we affirm the trial court's disposition of count II of Premier's complaint.

### III

Premier's third request for additional payment was to cover the cost of supplying at Benson's direction a higher-priced brand of bus duct than that used to prepare its bid. Benson initially rejected Premier's claim on the ground that the brand ordered to be substituted was the same brand originally specified in the bid documents and the contract. Premier countered by arguing that the initial specifications called for the brand actually installed "or another approved equal."

Although Benson replied that no other "equal" was ever "approved," Premier points to the alternate brand name written into the bid submitted to Benson, which bid was in turn used by Benson in preparing its bid for the general contract. Additionally, after Benson passed along Premier's claim to Ford, Ford rejected the claim on the ground that the bid documents specified use of the substituted brand.

Premier did not affix to its complaint a complete copy of all the contract documents because both parties acknowledged they had copies, the documents themselves were voluminous, and the pertinent sections were either included in the pleadings or established by other documents and correspondence made part of the record. For purposes of review, "properly pleaded allegations and well-pleaded facts must be taken as true and admitted in the face of a motion to dismiss." (*Pollack v. Marathon Oil Co.* (1976), 34 Ill. App. 3d 861, 864, 341 N.E.2d 101, 104.) Therefore, it is clear from the argument outlined above that there is a genuine question concerning a material term of the contract.

■■ Correspondence from Ford indicates that the contract term specified the brand of duct eventually installed; Premier claims that by accepting its bid naming the alternate brand, Benson tacitly approved that choice, so the contract term is the alternate brand. The trial judge stated correctly that "[w]hat the contract says is a question of law for the court to decide unless it is ambiguous and requires extrinsic evidence." No extrinsic evidence is needed here; the question of the term concerning the bus duct can be decided by interpreting the pertinent language of the various documents comprising the entire contract. "It is well settled in Illinois that the construction, interpretation or legal effect of a contract are issues to be resolved by the court as questions of law." (*Illinois Valley Asphalt, Inc. v. La Salle National Bank* (1977), 54 Ill. App. 3d 317, 319-20, 369 N.E.2d 525, 528.) Because the dispute-resolution paragraph limits its application to questions of fact, a question of law is not a question both parties agreed to settle either by arbitration or by Ford's final and conclusive decision. We find, therefore, that the trial court erred in dismissing count III of Premier's complaint.

■■ As the foregoing discussion clearly demonstrates, the dispute-resolution paragraph is not so overly vague that Premier should not be held to its provisions. "[A] contract fairly entered into for an adequate consideration cannot be avoided or disregarded by one of the parties to it because he discovers that the contract is less profitable to him than he anticipated when he entered into it." (*Diedrich v. Northern Illinois Publishing Co.* (1976), 39 Ill. App. 3d 851, 857-58, 350

N.E.2d 857, 862.) One is presumed to know the contents and meaning of the obligations he undertakes when he signs a written contract. (*Leon v. Max E. Miller & Son, Inc.* (1974), 23 Ill. App. 3d 694, 320 N.E.2d 256.) "Mature adults have a duty to be fully advised as to the nature of the contents of a binding agreement." (*Preston A. Higgins & Co. v. Stevenson* (1975), 28 Ill. App. 3d 150, 153, 328 N.E.2d 79, 81.) We therefore find unpersuasive Premier's final argument: "Premier *** had no idea in entering into the Agreement that it would be submitting such issues as Ragnar Benson's liability for Premier's alleged misplaced reliance or Ragnar Benson's damages, or for ordering materials changes, to Ragnar Benson, the very party whose very liability would be in question (or even to Ford, who in turn might be liable to Ragnar Benson)." Absent fraud, duress, coercion, mutual mistake, or some other nullifying factor not present in the instant case, *caveat signator.*

For the reasons discussed above, we affirm in part, reverse in part, and remand to the trial court for proceedings in accordance with this opinion.

Affirmed in part, reversed in part, and remanded.

JOHNSON, P.J., and ROMITI, J., concur.