FRATERNAL ORDER OF POLICE LODGE NO. 108 *et al.*, Plaintiffs-Appellee, *v.* THE VILLAGE OF WASHINGTON PARK, Defendant-Appellant.

Fifth District   No. 83—86

Opinion filed April 6, 1984.

Stephen R. Rice, of Rice, Durso & Rice, of Belleville, for appellant.

Thomas Benedick, of O'Fallon, for appellees.

JUSTICE JONES delivered the opinion of the court:

Plaintiffs, Fraternal Order of Police Lodge No. 108 and Joseph Russell, brought the instant action to compel the defendant, the village of Washington Park, to arbitrate the issue of sick pay for member police officers. The action was based upon the parties' collective-bargaining agreement, which provided for the arbitration of disputes arising under the agreement. By way of defense, the village contended that it had lawfully terminated the collective-bargaining agreement before grievance procedures were initiated under that agreement. After a hearing the trial court entered judgment in favor of the plaintiffs and ordered the defendant to submit to arbitration. We affirm.

It was stipulated by the parties that the agreement concerning sick pay was in effect at least until December 15, 1981. On that date the village board of trustees passed a resolution terminating the agreement. The plaintiffs subsequently initiated grievance procedures concerning claims for sick pay by 10 village police officers for the week of December 7, 1981, through December 15, 1981. Despite the fact that the plaintiffs followed grievance procedures set out in the agreement, the village refused to submit to arbitration on the issue of sick pay.

The plaintiffs filed a petition to compel arbitration, and a hearing was held on the complaint. Kenneth Koski, chief of police for the village, testified that immediately prior to December 4, 1981, there were 10 full-time police officers, seven part-time police officers, and four police dispatchers employed by the village. On December 1, 1981, Joseph Russell, one of the 10 full-time officers, was "laid off" by the village. A dispute arose between the plaintiff police union and the village regarding the decision to lay off Joseph Russell.

On December 4, 1981, all of the officers assigned to the day shift (8 a.m. to 4 p.m.) reported for duty. The whole shift of three officers assigned to work from 4 p.m. to 12 a.m. reported in sick. The two officers working the 12 a.m. to 8 a.m. shift the next morning also called in sick. On December 5, 1981, only one officer appeared for duty, and the other officers called in sick.

All of the officers who had reported in sick on December 4-5, 1981, stayed off work until December 16, 1981. In addition to the seven full-time police officers failing to report for work during that

period, three full-time dispatchers called in sick, and all of the part-time officers contacted during that time declined to work.

On December 15, 1981, police chief Koski was directed by the village board to order the men back to work. Koski sent registered letters ordering the officers to return to work or report to the village doctor for a physical. Koski stated that he believed all of the officers reported to the doctor.

"The doctor sent back doctor certificates stating what they [the officers] claimed their illness was and some of them were ordered back to work by him and some of them were still off a few days."

None of the officers violated the order to return to work, and all of the officers provided Koski with a doctor's excuse for the time they were off work.

Koski testified further that there had been no similar failure of police officers to report for work during the year prior to December 4, 1981. In Koski's six years as police chief, he had experienced no other period when approximately 60% of the police force was off duty at the same time.

Ralph Franklin, president of the village board of trustees, testified that the village had been in negotiations with the plaintiff police union prior to December 1, 1981, when Joseph Russell was laid off. At that time Russell had held the position of secretary of the union and was one of its negotiators.

Franklin stated that Thomas Benedick, attorney for the union, had met with the members of the village board following their regular meeting on December 8, 1981. On that occasion, Franklin testified,

"we discussed about [sic] the different things we were hung up on the contract. I think there [were] about three issues and we—two of them we got away with but the main thing he went back to them—I think we agreed with two out of three and he went back and told the officers of the union and he came back and he said there would be no deal unless Mr. Russell [was] called back to work. There wouldn't be no settlement [sic] of the contract."

According to Franklin, Benedick "indicated" that the work stoppage would be ended if Russell were reinstated but "[h]e didn't say it. I don't know what kind of words [sic] because everyone was talking about it after he left." The board refused to call Russell back to work at that time.

At its next regular meeting on December 15, 1981, the village board passed a resolution terminating the contract between the police-

men and the village. Franklin stated that this decision was a result of the board's opinion that the policemen were on strike. That opinion was based upon the board's previous discussion with Benedick and upon statements given to the press by Benedick and others as well as upon "the logical thinking that seventeen guys all sick at one time [*sic*]."

Stephen Marty, called by the defendant, testified that he had been president of the police union in December 1981. As such he took part in the negotiations between the union and the village and also served as a union spokesman with the news media. Although he recalled having talked with a newspaper reporter from the Belleville News-Democrat during that period, he denied having made the statement that the "[police officers] will not be back until Russell is reinstated. Our position is that they shouldn't go back until they are 100 percent physically well." He admitted having told the reporter, however, that the police officers were suffering from "a very contagious strain of flu." Kathy Bruemmer, the reporter who conducted the interview with Marty, testified that Stephen Marty had in fact made the statement denied by him.

Following argument by the parties, the court ordered the village to proceed to arbitration on the issue of whether the police officers were entitled to compensation for the period in question. In making its ruling the court noted that the sole issue before it was whether the plaintiffs had a right to arbitrate the matter of sick pay and not whether the plaintiffs' actions constituted a strike so as to bar them from such compensation. Finding that the plaintiffs did in fact have the right to arbitrate under the agreement in effect at the time, the court ruled that the village "[could not now] be heard to have terminated [this right] after the cause of action arose."

On appeal from this judgment, the village contends that, because the plaintiffs here violated the terms of the agreement by engaging in an unlawful strike, they cannot invoke its provisions to compel arbitration of their claims for sick pay. The village asserts that the facts of this case clearly establish the existence of such a strike. Therefore, the village contends, it was justified in terminating its agreement with the plaintiffs, and the court's order to submit to arbitration under that agreement was erroneous.

Upon consideration of the agreement in question and the applicable law regarding the arbitration of disputes, we find that the trial court acted properly in requiring the parties to arbitrate the issue of the plaintiffs' claims for sick pay. By the terms of the agreement the parties were obligated to arbitrate "any dispute *** raised by the

[plaintiffs] against the Village involving the meaning, interpretation or application" of the agreement. Moreover, under section 1 of the Uniform Arbitration Act (Ill. Rev. Stat. 1981, ch. 10, par. 101), which is deemed to be a part of any such agreement in this State (*School District No. 46 v. Del Bianco* (1966), 68 Ill. App. 2d 145, 215 N.E.2d 25; *Premier Electrical Construction Co. v. Ragnar Benson, Inc.* (1982), 111 Ill. App. 3d 855, 444 N.E.2d 726), the parties' agreement was irrevocable except by mutual consent (3 Ill. L. & Prac. *Arbitration & Awards* sec. 3 (1953); see also *Golden Seed Co. v. Funk Seeds International, Inc.* (1974), 21 Ill. App. 3d 131, 315 N.E.2d 140). Thus, the village, without more, could not have unilaterally terminated the parties' agreement to arbitrate by its resolution of December 15, 1981.

While the village argues that it was justified in terminating the agreement because the plaintiffs' actions constituted a strike in violation of the agreement, the trial court correctly ruled that this was not an issue to be decided upon the plaintiffs' complaint for arbitration. Rather, under the applicable principles governing the arbitration of disputes, the court's inquiry was limited to the threshold question of the arbitrability of the plaintiffs' claims, and the court was precluded from making a determination regarding the merits of the dispute. (Ill. Rev. Stat. 1979, ch. 10, par. 102; *Security Mutual Casualty Co. v. Harbor Insurance Co.* (1979), 77 Ill. 2d 446, 397 N.E.2d 839; *Croom v. City of De Kalb* (1979), 71 Ill. App. 3d 370, 389 N.E.2d 647.) The plaintiffs' claims for sick pay here were, on their face, governed by the parties' contract, and the court could not accept the village's argument without ruling on the merits of the sick-pay issue. (*Cf. Stuart-Dean Co. v. Lurie* (1979), 69 Ill. App. 3d 844, 388 N.E.2d 118 (court declined to rule on the question of the defendants' alleged breach of contract, holding that the defendants could not avoid complying with the arbitration clause by merely alleging that the plaintiff had breached the contract).) The court therefore properly limited its inquiry to the arbitrability of the plaintiffs' claims, and we find no basis for reversing the court's decision in this regard.

Affirmed.

KASSERMAN and HARRISON, JJ., concur.