INTAGLIO SERVICE CORPORATION, Plaintiff-Appellant, *v.* J. L. WILLIAMS & CO., INC., Defendant and Third-Party Plaintiff-Appellee and Cross-Appellant.—(McCARTY BROTHERS, INC., Third-Party Defendant-Appellee.)

First District (4th Division)    No. 80-456

Opinion filed April 23, 1981.

O'Brien, Carey, McNamara, Scheuneman & Campbell, Ltd., of Chicago (Donald V. O'Brien, LaDonna Loitz Chuchro, and Stephen P. Bedell, of counsel), for appellant.

Marks, Katz, Johnson, Randall, Weinberg & Blatt, of Chicago (Donald L. Johnson and William Biederman, of counsel), for appellees.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

■■ The issue in this case is whether a person who agreed to build and lease a building can be held liable for damages suffered by the lessee, even after the promisor-lessor had sold the building to another, when the building did not meet the guarantees laid down in the specifications. The trial court held that promisor-lessor could not be held liable as a matter of law. We disagree and reverse.

The plaintiff, Intaglio Service Corporation, filed suit on June 14, 1974, alleging that on or about July 15, 1967, it had accepted a proposal submitted by the defendant, J. L. Williams & Co., Inc., whereby defendant would design, build and lease to plaintiff a plant and offices for gravure engraving; that the parties thereafter entered into a leasing agreement, and the defendant thereafter in furtherance of the agreement prepared or caused to be prepared plans and specifications for the building and in its capacity as designer engineer, general contractor and landlord proceeded with the construction of the building; that the plans and specifications contained certain guarantees; that in addition the defendant as engineer-designer impliedly warranted the adequacy and sufficiency of its plans and specifications to accomplish and produce the essential requirements of plaintiff's business operation; that completion of the building was delayed to the extent that plaintiff was not able to obtain occupancy until late October 1968; and the building was not substantially completed until January 31, 1969, and punch list and corrective work occurred well into 1970; that unless temperature and humidity are maintained within the tight tolerance described in the specifications, severe prejudice to plaintiff's machinery and chemical processes results and its product becomes unmerchantable; that the environmental control system furnished by defendant chronically overheats, undercools and

severely malfunctions from a humidity control standpoint. The defendant in its answer denied most of the allegations but did admit it had served as general contractor in the construction of the building.

The contract of August 21, 1967, between the two parties reads in relevant part as follows:

## "ARTICLE I

### PREMISES AND TERM

Lessor * * * leases to the lessee * * *:

TO HAVE AND TO HOLD the above described premises, together with the buildings and improvements situated thereon * * * for and during a term of twenty (20) years commencing on the first day of the month following the substantial completion of the building and improvements which are to be constructed pursuant to the provisions of Article II hereof, * * *. The leased premises shall be deemed ready for occupancy and substantially completed when the Lessor procures and delivers to Lessee a certificate of occupancy and other permits, if any, required by local authorities for use and occupancy of the premises by Lessee under the terms of this lease and when the architect, hereinafter named, shall so certify in writing directed to the respective parties; or when after the receipt of such certificate of occupancy and permits the Lessee shall have entered said premises, taken possession, and commenced business therein, whichever shall first occur. Upon issuance of architect's certificate aforesaid or on the date of entry by Lessee for commencement of its business Lessee shall issue and deliver its letter accepting the premises as completed in accordance with the plans and specifications provided for in Section 1 of Article II of this lease. The obligation of the Lessee to pay rent and to perform all of the covenants, conditions and agreements of this lease on the part of the Lessee to be performed shall not commence until said premises shall be deemed ready for occupancy and substantially completed as herein defined. The fact that the Lessee takes possession upon substantial completion and the term of the lease has commenced shall not, however, excuse Lessor from the prompt completion of all work required to be done by Lessor pursuant to the terms of this lease. * * *

## ARTICLE II

### IMPROVEMENTS TO BE ERECTED

Section 1. Prior to the commencement of the term of this lease, Lessor shall erect and complete, at Lessor's expense, a one-story

office and brick manufacturing building containing approximately 60,000 square feet, including approximately 52,000 square feet of air conditioned space. All work will be done in accordance with plans and specifications prepared by Thomas A. Rambert, Architect, and approved and initialed by Lessor and Lessee.

Section 2. [Provides for liquidated damages for each day completion delayed beyond July 1, 1978.]

Section 3. Lessor warrants that the building and improvements shall be free from defects of workmanship and materials. Lessor will promptly repair, remedy or replace any such defects which may appear within the first year of the term of this lease. * * *

## ARTICLE V

### USE AND CARE OF PREMISES

Section 1. Prior to taking possession of the demised premises hereunder, Lessee will have inspected said premises and the improvements thereon and will acknowledge that said premises are found to be in a safe and satisfactory condition. * * *

* * *

Section 4. Lessee shall use and occupy the demised premises for its business of rotogravure, letterpress, offset or other engravings process and the storage of supplies, materials and equipment relating to such business, and for any other lawful purpose. * * *"

Specifications drawn up by the architect Rambert were approved on November 6, 1967. In the specifications are the following provisions:

"51 *Guarantee*: *Material and Workmanship*

(a) The Contractor shall guarantee all materials, equipment and labor to be free of defects, and shall agree to replace or repair, without cost to the Owner, any such defects within twelve (12) months of date of final acceptance by the Owner.

(b) He shall also guarantee that all workmanship is of high quality and that all duct-work and equipment is installed in accordance with the best accepted practice, and that all equipment furnished under this Contract fulfills the requirements of the Specifications.

52 *Guarantee*: *Temperature and Humidity*

[Sets out specific temperature and humidity ranges for heating and cooling units.]"

On November 15, 1968, after taking possession of the not-yet-completed premises, the plaintiff, as required by the lease, sent a letter of acceptance stating in part that the lessee had accepted possession of the leased premises, the lease was in full force and effect and binding upon the lesser and lessee, there existed no default on the part of either party, any improvements contemplated by the lease had been substantially

completed as required in the lease and in all collateral agreements or plans and specifications respecting the lease, and that the improvements were satisfactory for the lessee's purpose. In fact, however, it appears from correspondence introduced into evidence that there were many problems in connection with the building and facilities. After the acceptance, the defendant conveyed the building and the lease to Northwestern Mutual Life Insurance Company.

The defendant moved for summary judgment under sections 48 and 57 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, pars. 48 and 57), contending (1) defendant did not owe plaintiff an implied duty to repair; (2) the lease neither expressed nor implied that defendant had any duty to design the leasehold improvements; (3) plaintiff's acceptance of the premises necessarily limited defendant's duties to those contained in the lease; (4) the conveyance of the property to Northwestern Mutual relieved defendant of all lease-related duties. The court granted the defendant's motion. Defendant had filed a third-party action for indemnification against McCarty Brothers, Inc. This action was dismissed at the same time.

● 2 We agree with the defendant that the evidence so far introduced does not disclose a duty on the defendant to design the buildings. Likewise despite statements by the plaintiff in its brief and on oral argument to the contrary, we have been unable to find evidence indicating whose agent the architect was. If the architect was not the defendant's agent, and especially if he was the plaintiff's agent, then defendant would not be responsible for any of the architect's errors in design. (Compare *St. Joseph Hospital v. Corbetta Construction Co.* (1974), 21 Ill. App. 3d 925, 316 N.E.2d 51, *appeal denied* (1974), 57 Ill. 2d 606; *Georgetown Township High School District v. Hardy* (1976), 38 Ill. App. 3d 722, 349 N.E.2d 88, *appeal denied* (1976), 63 Ill. 2d 556.) None of this is relevant, however, as long as plaintiff only claims that defendant failed to comply with the gurantees set forth in the contract since a contractor is responsible for the work he guarantees (*H. D. Foss & Co. v. Whidden* (1925), 254 Mass. 146, 149 N.E. 679), whether the defect is due to the contractor's work or that of a third person. (*City of Lake View v. MacRitchie* (1890), 134 Ill. 203, 25 N.E. 663.) As that case stated at 134 Ill. 203, 208-09, 25 N.E. 663, 664:

"No reason is perceived why contractors may not guarantee against all defects, whatever their origin, —whether they arise from insufficiency of the materials supplied, from unskillfulness of workmen, or from unfitness of the plan or design, —whether devised by the one or the other of the parties to the contract, or by some other person. In case of a contract with such warranty, it will

be presumed that the consideration for the guaranty was included in the price agreed to be paid for the work to be done. It is not unreasonable to suppose that one desiring a fabric or structure, or an apparatus, or a piece of mechanism to be made, the idea of which is his own or that of his servant or agent, may wish to take the judgment as to its practicability, usefulness and durability, of some person or persons who have a practical knowledge and experience in the construction of things of that sort, and in such case the requirement of a guaranty would be an effectual way of getting the benefit of such judgment. It is the province of the courts to enforce the contract which the town and these contractors have made, —not to make a contract for them. It must be presumed, that had it been their intention to limit the guaranty to the workmanship of the contractors and their servants, and to the materials furnished, such intention would have been expressed in the contract."

# I

In this cause plaintiff's primary contention is that defendant's work did not meet the guarantees set forth in the specifications. Under the specifications, the defendant, as general contractor, guaranteed or warranted (see *Parker Pen Co. v. Federal Trade Com.* (7th Cir. 1946), 159 F.2d 509; *Menici v. Orton Crane & Shovel Co.* (1934), 285 Mass. 499, 189 N.E. 839), that certain temperatures and humidity controls would be met. Accordingly it is clear that if the specifications are part of the contract, the defendant is bound by those guarantees unless some defense is available. ■■■ In light of the fact that articles I and II both referred to the plans and specifications and required the building to be built in conformity with them, it is clear that the plans and specifications were part of the lease contract (*Chicago Trust & Savings Bank v. Chicago Title & Trust Co.* (1901), 190 Ill. 404, 60 N.E. 586; *City of Lake View v. MacRitchie* (1890), 134 Ill. 203, 25 N.E. 663; *Jacksonville Hotel Building Corp. v. Dunlap Hotel Co.* (1931), 264 Ill. App. 279, *mod. & aff'd on other grounds* (1932), 350 Ill. 451, 183 N.E. 397.) Since the initial lease and the specifications were all part of a single contract, it follows that defendant's contention that there was no consideration for the guarantees was without merit. The various undertakings of the total contract were all consideration one for the other. Furthermore, it is doubtful whether there was an enforceable contract until the specifications were drawn up. If a document parties agree to draft is to contain any material term that is not

already agreed upon, no contract is made until that term is agreed upon; in this case the specifications constituted such a material term. *Brodsky v. Allen Hayosh Industries, Inc.* (1965), 1 Mich. App. 591, 137 N.W.2d 771.

## II

It is clear therefore that the defendant is responsible if it has failed to comply with the guarantees in the contract unless, as it argued below, recovery is barred either because of the plaintiff's acceptance of the property or because the defendant conveyed the property to Northwestern.

## A

It does not appear that defendant is arguing that plaintiff's acceptance acted as a waiver of the objected-to defects, and indeed the defendant has produced no evidence to show that as a matter of law it did act as a waiver. It is true that an absolute and unconditional acceptance of the work can act as a waiver of all patent defects, but it is obvious, both from the terms of the lease itself and the subsequent conduct of the parties, that the acceptance of the property was not expected or intended to relieve the defendant from its duty either to complete the work pursuant to the contract or to repair defects. (*Broncata v. Timbercrest Estates, Inc.* (1968), 100 Ill. App. 2d 49, 241 N.E.2d 569.) Furthermore, a waiver is an intentional relinquishment of a known right (*Lempera v. Karner* (1979), 79 Ill. App. 3d 221, 398 N.E.2d 224; *Florsheim v. Travelers Indemnity Co.* (1979), 75 Ill. App. 3d 298, 393 N.E.2d 1223), and acceptance of a structure does not waive proper performance where the person neither knows nor has reason to know of its defective nature. (*A. H. Sollinger Construction Co. v. Illinois Building Authority* (1972), 5 Ill. App. 3d 554, 283 N.E.2d 508; *Rehr v. West* (1948), 333 Ill. App. 160, 76 N.E.2d 808 (abstract).) The burden to prove waiver is on the party pleading it (*Slavis v. Slavis* (1973), 12 Ill. App. 3d 467, 299 N.E.2d 413; *Insurance Co. of North America v. Knight* (1972), 8 Ill. App. 3d 871, 291 N.E.2d 40, *appeal dismissed* (1973), 414 U.S. 804, 38 L. Ed. 2d 40, 94 S. Ct. 165), and the defendant has produced no evidence tending to show that plaintiff at the time it accepted the building had knowledge of the facts of which it is now complaining.

Defendant in its brief contends that completion of the leasehold improvements in a condition satisfactory to plaintiff was a condition precedent to the commencement of the lease term, that once the building was accepted the lease agreement became operative, the rights of the parties were locked into and defined by the lease and that thereafter defendant was only liable for a breach of its express duty to repair.

It does not appear that the lease required the completion of the improvements in a condition satisfactory to the plaintiff before the lease would begin. It merely seems to require substantial completion of the project. But even if we agree with the defendant's premise, the conclusion it argues does not follow from it. While the terms of the lease did not run until the building was substantially completed, the "lease" contract was in effect from the time the parties agreed on its terms, *i.e.*, at least from the time the plans and specifications were agreed upon. The rights of the parties were always locked into and defined by the terms of this lease agreement, which, as we have already ruled, included these plans and specifications. And finally, the existence in the contract of a provision imposing a duty to repair upon the defendant for one year in no way bars plaintiff after that one year from claiming damages as a result of faulty or insufficient work or material. *Board of Regents v. Wilson* (1975), 27 Ill. App. 3d 26, 326 N.E.2d 216, *appeal denied* (1975), 60 Ill. 2d 595.

## B

It is unnecessary for us to determine whether any of the express covenants in the lease ran with the land (but see *Jacksonville Hotel Building Corp. v. Dunlap Hotel Co.* (1932), 350 Ill. 451, 183 N.E. 397). A conveyance of the reversion by the defendant did end the privity of estate between plaintiff and defendant, but the defendant is still bound under privity of contract to the plaintiff. (*Leonard v. Autocar Sales & Service Co.* (1945), 392 Ill. 182, 64 N.E.2d 477, *cert. denied* (1946), 327 U.S. 804, 90 L. Ed. 1029, 66 S. Ct. 968; *Springer v. DeWolf* (1901), 194 Ill. 218, 62 N.E. 542; *Kagan v. Gillett* (1933), 269 Ill. App. 311; *Johnston v. Messinger* (1922), 226 Ill. App. 397.) As stated in *Higgenbotham v. Topel* (1973), 9 Wash. App. 254, 257, 511 P.2d 1365, 1367:

> "It is contended this liability was a covenant running with the land and, therefore, when the land was sold on contract and the lease assigned to Dregers, the Bishop was relieved from liability and Dregers became the sole liable party. We disagree. As observed in 1 H. Tiffany, *Real Property* §116, at 182, (3rd ed. 1939):
>
>> Though a lessor transferring his reversionary interest loses, it seems, any right of action for subsequent breaches of the lessee's covenants, he still remains liable on his own covenants, since *one cannot, by his own act, without the consent of the other party, relieve himself from a contractual liability*, the same principle being applicable here as in the case of an assignment of the leasehold, by which the original lessee is not relieved from liability on his covenants.
>
> (Italics ours.) *See also* 20 Am. Jur. 2d *Covenants, Conditions and Restrictions* §25 (1965); 21 C.J.S. *Covenants* §86 (1940); *Glendale v.*

*Barclay*, 94 Ariz. 358, 385 P.2d 230, 232 (1963); *DeLano v. Tennent*, 138 Wash. 39, 43, 244 P.273, 45 A.L.R. 766 (1926)."

It is axiomatic that a person is entitled to choose his own obligor and cannot be forced to accept an assignee instead of the obligor. (6 Am. Jur. 2d *Assignments* §110 (1963).) To allow any other result would be to allow any owner-contractor to avoid the consequences of his own negligence by the simple expedient of conveying the property.

Since in light of the foregoing it is clear that defendant has failed to establish that as a matter of law plaintiff cannot possibly recover on its complaint, we reverse and remand that case for trial. We also reverse and remand the dismissal of the third-party complaint.

Reversed and remanded.

JOHNSON and LINN, JJ., concur.