BRUNO PRESKI, d/b/a Plaza Excavating Contractors, Plaintiff-Appellant and Counterdefendant-Cross-Appellee, *v.* WARCHOL CONSTRUCTION COMPANY, INC., Defendant-Appellee and Counterplaintiff-Cross-Appellant.

First District (4th Division) No. 81—2973

Opinion filed December 30, 1982.

Michael J. Wall, of Rothschild, Barry & Myers, of Chicago, for appellant.

Louis C. Warchol, of Chicago, for appellee.

JUSTICE ROMITI delivered the opinion of the court:

After the completion of a construction project, both contractor and subcontractor sued each other. The contractor sued for the cost of completion of work not performed by the subcontractor, and the subcontractor sued for certain sums unpaid and for extras. The trial court found that the subcontractor had breached the subcontract and also denied *sub silentio* the subcontractor's claims. It also refused to grant the contractor the full amount sought, finding that certain claimed expenditures were unproven. Both sides have appealed. We affirm in part, reverse in part and remand for trial.

In 1973 Warchol (hereinafter called contractor) entered into a construction contract with the Capitol Development Board of the State of Illinois. Thereafter contractor entered into a subcontract with Plaza Excavating Contractors (hereinafter called subcontractor). The subcontract provided that for the sum of $113,500 the "subcontractor shall furnish and install the following described work in accordance with the contract between the Owner and the General Contractor and the Drawings and Specifications titled" followed by the typed provision:

> "The DAVEA CENTER, ***, as per drawings T, L, C1 to C5, 1 to 23, FS-1, FS-1M, FS1-V, FS-1E, S1 to S10, P1 to P13, H1 to H15, ME1 to ME3, LC1 to LC8, E1 to E12, SE1 to SE9 all dated 3/23/73 and specifications. Addendum #1 dated 4/2/73, Addendum #2 dated 4/11/73 and Addendum #3 dated 4/18/73 all as prepared by Daverman Associates, Inc., Architect and Engineers.

*EARTHWORK* complete, including grubbing, tree removal, demoli-

tion, stripping, cut and fill work, excavating, trenching, backfilling (within the building and exterior sidewalks with granular fill), 4" minimum sand under slab, grading, removal of spoil, construct access road (stone excluded), retention pond, accessories and auxiliary work.

Work to be done in accordance with job schedule requirements.

Site to be rough graded and trenching started within 3 weeks.

Furnish excavating equipment for ground breaking ceremony.

If Warchol Construction Company authorizes in writing the following alternate work, same to be included for their respective prices:

Alternate G-11 (spreading of top soil) ..............$19,800.00
Alternate G-6 .................................................$1,675.00[*sic*]
Alternate G-7 .................................................$ 1,900.00
Alternate G-8 .................................................$   375.00

*EXCLUSIONS*

NO SHEETING, SHORING OR PUMPING
NO HAND LABOR
NO FROST RIPPING
NO ENGINEERING OR LAYOUT WORK
NO SOILS TESTING"

The subcontractor completed much of the work and was paid $96,300. In 1974 the contractor demanded that the subcontractor spread the topsoil which had been removed and stored in a mound. The subcontractor claiming this fell within alternate G-11 of the specifications refused to do so unless paid $19,800. The contractor took subcontractor's claimed interpretation of the specifications first to the architect and then to arbitration; both ruled that the placement of topsoil was part of the base bid and not part of alternate G-11. Capitol and contractor were parties to these proceedings; subcontractor was not. However, the evidence indicates that the subcontractor did attend the arbitration hearing and testified there. Contractor acquiesced in the findings and demanded that subcontractor perform. Subcontractor refused to return to the job and other subcontractors were hired.

The trial court, after hearing all of the evidence, found that the subcontractor had been paid $96,300 of the $113,500 contract price,

leaving $17,200 unpaid. Certain work could not be done by subcontractor for various reasons beyond its control; this included completion of cutting and grading a retention pool, the backfilling of certain curbs, and the furnishing and compacting of sand for various sidewalks. The amount which would have been paid for the work if done would have been $8,272. The evidence also showed that subcontractor failed to complete other work, but as to some of its work the amount spent by contractor to have the work completed by others was insufficiently shown. It was established that $1,534 was spent for debris and the removal and the cutting of a loading dock and $12,022.05 to complete the grading and spreading of the topsoil, which work the court agreed was not the fine grading falling under G-11. The court awarded the contractor $4,628.05, the difference between the total amount of proved expenses incurred by the contractor and the total amount unpaid under the contract.

I

The subcontractor's defense is based on the premise the the words "spreading of top soil" controls the rights of the parties. It is, however, improper to take words of a contract out of context or read only one provision alone. Rather a contract must be read as a whole and all parts construed together. (*White v. White* (1978), 62 Ill. App. 3d 375, 378 N.E.2d 1255.) Furthermore, in light of the specific adoption in the subcontract of the drawings and specifications provisions of the prime contract, those provisions become as much a part of the subcontract as if they were expressly written in it. (*City of Lake View v. MacRitchie* (1890), 134 Ill. 203, 25 N.E. 663; *Intaglio Service Corp. v. J. L. Williams & Co.* (1981), 95 Ill. App. 3d 708, 420 N.E.2d 634; *Heifner v. Board of Education* (1975), 32 Ill. App. 3d 83, 335 N.E.2d 600.) They cannot be ignored.

Grading is defined in the specifications which are a part of the contract. The one doing the grading was required to "redistribute the stockpiled topsoil and/or additional topsoil as required to the final contours shown on the plot plan at the direction of the Engineer." This, as the architect correctly ruled, was precisely what was demanded here. Accordingly, the subcontractor was obligated by the clear language of the basic subcontract to spread the stockpiled topsoil, and when it did not do so it breached its contract.

■ The existence of the alternate G-11 in the contract does not change this result. The first listed alternate does not read "spreading of top soil" but "G-11 (spreading of top soil)." The meaning of G-11, just as G-6, G-7 and G-8, must be determined from the specifications.

Alternate G-11 is defined as consisting "of providing labor and materials for fine grading, and seeding of the site as shown on the drawings ***." Read together with the rest of the contract it is clear, as the trial court ruled, that there is no conflict between the terms and that the alternate related to lawns, seeding and grading and not to the work demanded here which is covered by the term grading. Had the subcontractor wished to exclude respreading to grade from the agreement, it could have added respreading to the exclusions expressly listed in the contract. Subcontractor's reliance on a printed provision in the contract that if any part of the agreement was in disagreement with specifications, drawings or owner's contract, the agreement would govern, is inapplicable both because there is no disagreement and because under the circumstances the specifications are part of "the agreement."

Furthermore, if the terms "grading" and "G-11 (spreading of top soil)" should both be considered to refer to spreading of the piled soil, then the contract must be considered ambiguous and parol evidence would be admissible. The testimony of the parties at trial establishes that in adding the phrase "(spreading of top soil)" they merely wanted to limit the subcontractor's obligations under G-11. Contractor's president testified, without contradiction, that about a week before entering into the subcontract the parties met and discussed the specifications. Subcontractor had a copy of the specifications book, and a complete set of plans and drawings. They discussed the earthwork in detail, including grading and the section on the redistribution of the stockpiled topsoil. Subcontractor had no objection to doing this work. However, while it was willing to do the fine grading involved in alternate G-11, it could not do the seeding or the work related to the seeding. The words "(spreading of top soil)" were put in the contract to meet these objections. Subcontractor's witness admitted that it had the relevant specifications before bidding and that when bidding on the G-11, it did not plan to do the seeding but only the spreading of the topsoil. Yet there is no express exclusion of seeding in the subcontract. So it would appear the words "spreading of top soil" were inserted to limit the work under G-11.

## II

The subcontractor's next contention is that it was entitled to more money because contractor in its affidavit to the owner in October 1975 listed subcontractor on the seventh line and allegedly made a request for payment of $111,000 (the copy of this affidavit in the record is illegible in many places and it is impossible to decipher the

heading of the column in question). Subcontractor contends that it is entitled to an additional $10,700. Subcontractor bases the claim purely on the affidavit; it does not enumerate any work done and not paid for. Furthermore, subcontractor's own witness testified without contradiction that these affidavits are not a true test of what has actually been done and it customarily may be up to 20% in error. In addition, it appears that the listing on the affidavit of subcontractor's work includes "top soil, in grading by others."

■ The trial court determined that of the $17,200 remaining on the subcontract, the subcontractor was not entitled to $8,272. This finding is supported by the record and has not been disputed by the subcontractor on appeal. The rest was set off against the contractor's larger recovery. Thus, the subcontractor's contention here is irrelevant.

### III

Subcontractor next complains that the trial court erred in failing to award $7,618.70 for certain alternates (G-6, G-7, G-8) and extras allegedly done. The trial court did not rule on this claim and the subcontractor did not below file any objection to this failure. But even assuming that this denial *sub silentio* is reviewable, we conclude that the evidence does not mandate a finding for the subcontractor.

Subcontractor's witness testified that as far as he knew the three alternates were done. He was requested by contractor's job superintendent to do the alternates. This request was made in July 1974; the subcontractor was still on the job all that time although the witness admitted they did not work "to any extent" in 1974. The request was made at the job site. He did not believe the alternates were authorized in writing although the contract required the authorization to be in writing. Likewise the alleged requests for extras were merely made by the on-site job superintendent who signed work tickets. There were no formal change orders. The contract provided that no changes in the terms of the agreement should be made unless authorized in writing by the president of contractor. Contractor's president testified that there were no extras on the job. He did not authorize any change orders and no proposals were accepted. He indicated that the work shown on the two work tickets introduced in evidence by subcontractor related to work which had to be redone because rejected and was not an extra. He testified, and this testimony was supported by a letter sent by the architect to the subcontractor, that alternates G-6 and G-7 were never accepted and made a part of the contract. He also testified that while alternate G-8 was accepted, this acceptance was re-

scinded. No alternates were accepted or work done. Furthermore, subcontractor did no work on the site in 1974. Contractor's general superintendent also testified that subcontractor did no work on the site in the first nine months of 1974.

■■ From the evidence, the trial court could reasonably conclude that no alternates or extras were done and that none were authorized in writing as required by the contract. Subcontractor contends that the contractual requirements as to written consent may be waived. This is true, but there was no evidence in the record showing contractor either waived these requirements or should be estopped from relying on them. That subcontractor was aware of the necessity of written consent is shown by the fact that various written proposals were submitted and not accepted.

## IV

Finally, subcontractor contends that the whole case must be reversed because the trial court erred in its conclusions on two minor points in that:

(1) its conclusion that the subcontractor had an excuse for not backfilling the curbs is unsupported by the evidence; and

(2) its conclusion that subcontractor did not compact sand under various sidewalks is unsupported by any evidence in the record.

It may be true, as subcontractor contends, that the trial court erred in finding the subcontractor had an excuse for not backfilling the curbs. But the subcontractor was not injured by this finding. If, as subcontractor concedes, the breach was not excused, then the amount of damages awarded against the subcontractor should have been greater. The subcontractor's witness did testify it had furnished and compacted all the sand "as far as he could recall." But contractor's general superintendent testified that no sand had been supplied because it was not at the proper grade. The credibility of the witnesses is for the trial court to decide.

■■ The frivolous character of subcontractor's contention is, however, manifest from the fact that even if the contentions were correct, they could not justify a reversal of the total verdict and a new trial. At most, they might justify a reduction of the amount of damages by the amount due from compacting the sand reduced by the amount due contractor for subcontractor's admittedly unjustified failure to backfill the curbs. Subcontractor never sought this remedy.

## V

Contractor in its counterclaim sought to recover $8,203 paid to

another subcontractor, Rock Road Construction Company (Rock Road), to complete certain work in preparation and grading of unfinished lots and an access road which subcontractor had left unfinished. The trial court found that subcontractor had failed to complete this contracted-for work and that contractor was obliged to secure other subcontractors to complete the work but that, in certain respects, the record is not adequate for the court to determine what specific expenses were incurred, or the specific nature of the work done by Rock Road. Contractor appeals from the trial court's refusal to admit into evidence, except as proof certain payments were made, daily report sheets required by contractor. These daily reports were prepared by Rock Road and immediately verified by contractor, who then keep them as part of its records. It is contractor's position that since these records showed the precise work being done, the records, coupled with the substantiating evidence of both of contractor's witnesses, including the testimony of its president that a fair, usual and customary charge for Rock Road's services in completing subcontractor's work was $8,203 which was paid, established a *prima facie* case. Contractor further contends that since this evidence was admittedly unrebutted by subcontractor, it entitled contractor to an additional award of $8,203. Contractor does not contend that its president's testimony alone established a *prima facie* case so we do not rule on that question.

Contractor's general superintendent testified that it arranged for Rock Road to complete subcontractor's preparation of grading work on areas to be paved on a time and material basis. A verification procedure was set up. Daily tickets were signed in the field for the amount of work done on that specific day. Each of the tickets indicated what work was done on that particular day. They show the work done, the people involved in the work, the occupation, the rate for the hours worked, and the total amount plus rental of equipment per hour. Each ticket was then verified by someone from contractor, who reviewed them and then signed them after making any necessary corrections. These are the only records which verified what work Rock Road had done. Contractor would keep, as a normal course of its business, a copy of these tickets to verify Rock Road's billing. Subcontractor objected to the introduction of the tickets on the basis they were not business records; the preparer was not in the courtroom; and the witness was not the one who verified them. The court admitted them only to show the amount billed but not as evidence of the work done.

Witnesses testified Rock Road graded parking lots, service roads

and courtyards. They were paid $8,203 in addition to that paid under their own paving contract.

Contractor's president testified, without objection, that $8,203 was a reasonable figure and the fair, usual and customary value of the excavating work done by Rock Road in completing subcontractor's contract. It did this work and was paid $8,203 for it. The additional payments made to Rock Road were for additional work done by Rock Road and not charged back against subcontractor. Subcontractor introduced no evidence in contradiction.

It was established in *Consumers Construction Co. v. County of Cook* (1971), 1 Ill. App. 3d 1087, 275 N.E.2d 696, that daily progress reports prepared by a contractor may be introduced into evidence by him as business records. It follows that the daily reports here were admissible and should have been admitted unless the fact that while the reports were verified by the contractor, they were not prepared by the contractor takes them out of the business records rule.

Supreme Court Rule 236(a) (73 Ill. 2d R. 236(a)) provides:

"Any writing or record, whether in the form of any entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility. The term 'business,' as used in this rule, includes business, profession, occupation, and calling of every kind."

Nothing in the rule requires that the custodian be the preparer of the records or that they can only be introduced into evidence by the preparer. To the contrary, the purpose of the rule is to liberalize the rules of evidence pertaining to regular business records and to eliminate the need for the preparer's testimony. (73 Ill. 2d R. 236(a), Committee Comments.) As the comments note, all that is required is that the custodian of the records or someone familiar with the business and its mode of operation testify at trial as to the manner in which the record was prepared. The general superintendent did that here.

The basic modern approach to the competency of evidence starts from the premise that all evidence is competent until the reverse is shown. (*Consumers Construction Co. v. County of Cook* (1971), 1 Ill.

App. 3d 1087, 275 N.E.2d 696.) It is true as it was in *Consumers* that "[t]he proof shows that these documents were kept in the ordinary course of business in performance of the contract. They were made pursuant to a specific requirement of the contract. This qualified them for admission as business records within the scope of Rule 236 of the Supreme Court of Illinois." 1 Ill. App. 3d 1087, 1091, 275 N.E.2d 696, 698.

■ While some cases, reading into the act limitations not set forth, would require the custodian to be the preparer of the records, the better rule is to the contrary. (See, for example, *Kaufman & Broad Homes, Inc. v. Allied Homes, Inc.* (1980), 86 Ill. App. 3d 498, 408 N.E.2d 91; *Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043.) The accuracy of the records does not depend on whether its preparer is the custodian but whether they were, as here, prepared in the regular course of business under such circumstances as to call for accuracy in the making of the records.

*Kaufman* is directly in point. In that case plaintiff was seeking to recover 30% of the expenditures of the joint venture. To do so it had to show the amount paid and that these expenditures were for the joint venture. Over objection, it introduced into evidence invoices sent to it and its cancelled checks or copies of the checks in payment of these invoices. The court in upholding these exhibits as proper evidence of the amount spent for the joint venture stated:

"The rule regarding admission of business records (Ill. Rev. Stat. 1977, ch. 110A, par. 236) was adopted to eliminate restrictive rules which resulted in 'a mass of technicalities which serve[d] no useful purpose in getting at the truth' (5 Wigmore, Evidence 346, 361 (3d ed. 1940)). It was felt that the business of this great commercial country is transacted on records kept in the usual course of business and such evidence ought to be competent in a court of justice. (*People v. Small* (1925), 319 Ill. 437, 150 N.E. 435.) To that end, Rule 236 provides that:

'Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any *** transaction *** shall be admissible as evidence of the *** transaction ***, if made in the regular course of any business.' (Ill. Rev. Stat. 1977, ch. 110A, par. 236.)

If the plaintiff had maintained a cash disbursements journal, and a clerk had made an entry in that journal recording the payment of an invoice, noting among other information the check number, check amount, date, payee, invoice number, goods or services invoiced, and trade discounts taken, no issue

of whether Rule 236 applied would have been raised. The straightforward language of the rule would have forestalled such a challenge. But here, because the duplicate copy of the check and the invoice—from which data for such journal entries would be transcribed—are themselves retained as the record of the transaction, it is argued that Rule 236 does not apply. Because the plaintiff's method of recording cash disbursements eliminates the potential for transcribing error and thus is more reliable than a journal entry, we are urged to hold that the 35 exhibits are not business records. To do so would unreasonably elevate form above substance. The plaintiff's accounting records as admitted into evidence by the circuit court record in the usual and ordinary course of business its cash disbursements [*sic*]." 86 Ill. App. 3d 498, 503-04, 408 N.E.2d 91, 95.

■ The same is true here. The contractor could have copied the daily tickets after the verification or entered the information in some journal and clearly the record would have been admissible (*Consumers Construction Co. v. County of Cook* (1971), 1 Ill. App. 3d 1087, 275 N.E.2d 696), since entries made on the basis of memoranda made by another are admissible (*People v. Wells* (1967), 80 Ill. App. 2d 187, 224 N.E.2d 288) and under the supreme court rule lack of personal knowledge by its entrant or maker goes to the weight but not to the admissibility of the record. As in *Kaufman*, contractor's method of keeping its record of work done eliminated the potential for transcribing error and thus is more reliable than a journal entry. For us to refuse to admit the tickets into evidence when a journal would be admissible would be, as in *Kaufman*, to "unreasonably elevate form above substance."

■ ■ Nevertheless, we will not direct the trial court to increase its verdict to contractor by $8,203 as requested by contractor since the subcontractor may have relied on the court's refusal to admit the records as proof of work done in deciding not to put on any rebutting evidence. Rather, we affirm the judgment of the trial court in favor of the contractor and against the subcontractor, but reverse the trial court's denial of any damages for the work done by Rock Road and remand for retrial on the issue of damages for this work only.

Affirmed in part; reversed in part; and remanded for a new trial.

JIGANTI and LINN, JJ., concur.