EASTERBROOK, Circuit Judge.
 

 The Chicago, Rock Island & Pacific R.R. got out of the railroad business in 1980, after a bankruptcy court ordered it to do so and special legislation eased the way. Its extensive holdings enabled it to pay its debts in full, including debts to its pensioners. The Rock Island Line had operated its own pension plan, but its successor — Chicago Pacific Corp., principally a real estate company — had no desire to run a pension plan for the railroad’s former employees. One of the last acts of the Rock Island’s trustee in bankruptcy was to buy a single-premium annuity contract to cover the railroad’s pension obligations. The trustee took bids from several companies and bought an annuity from The Canada Life Assurance Co., which agreed to take over on March 1,1984. The trustee paid Canada Life about $8 million. The district court soon closed the bankruptcy case; Chicago Pacific assumed the Rock Island’s rights and liabilities.
 

 Chicago Pacific believes that it bought an annuity providing benefits identical to those under the old pension plan; Canada Life believes that it sold Chicago Pacific a distinctive contract, and that if its provisions do not match those of the plan, that is too bad for Chicago Pacific (which may have to make up the difference to the pensioners). The bone of contention is the treatment of former employees who quit (or were let go when the railroad expired) before the normal retirement age of 65. The pension plan permitted employees with 10 or more years of service to retire at age 60. Chicago Pacific contends that the monthly benefits for retired employees may not be lower than $45, no matter when they retire; Canada Life believes that the minimum at age 65 is $25 per month, which may be reduced for early retirement. Since many of the employees at the time the Rock Island Line dispatched its last train were less than 60 years old, they have no reason to defer “retirement” until 65. If entitled only to the minimum were they to start drawing benefits at 65, they are sure to start drawing at 60, for they lose nothing. The difference may be substantial; Canada Life says that the actuarial value is more than $200,000.
 

 When Canada Life performed the computations underlying its bid, it assumed that all former employees would elect to start receiving benefits at 65, and that if they required benefits earlier the monthly payment would be reduced to make the actuarial value of the payments the same as if the
 
 *336
 
 benefits had begun at age 65. Most workers earned enough that the monthly payment, even after the reduction for commencement at age 60, will exceed $45; Chicago Pacific and Canada Life agree about how these pensioners should be treated. The also agree that anyone who starts drawing benefits at age 65 is entitled to a minimum sum per month. The firms do not agree, however, about what to do when the actuarial reduction for early payment takes the monthly benefit under $45. The bite into a given pensioner’s check could be a large percentage of the benefits, for a pensioner who waits until 65 has given the underwriter an extra five years’ use of the money, has fewer years to live (and thus will get fewer monthly payments), and might have died before reaching the normal retirement age.
 

 Chicago Pacific filed a petition asking the district court to declare that Canada Life must pay every annuitant at least $45 per month. It apparently believed that the court, having approved (in its bankruptcy role) the purchase of the annuity, was entitled to adjudicate any dispute arising out of that contract. Neither party questioned the jurisdiction of the court, which did not inquire into its own jurisdiction. More than a year before the district court made its decision, however, we held — in a case arising out of this very bankruptcy proceeding, involving the same judge — that a bankruptcy court does not have jurisdiction to adjudicate contract disputes just because the contract was made and approved as part of the reorganization.
 
 In re Chicago, Rock Island & Pacific R.R.,
 
 794 F.2d 1182, 1187-88 (7th Cir.1986).
 

 Once a bankruptcy court approves a contract, the resolution of disputes is a question of state law to be resolved in state courts, unless there is an independent ground of federal jurisdiction. It turns out that there is one: the alien diversity jurisdiction provided by 28 U.S.C. § 1332(a)(2). Chicago Pacific is a Delaware corporation with its principal place of business in Chicago. Canada Life is a Canadian corporation with its principal place of business in Toronto. The amount in controversy is about $200,000. These facts appear only in Canada Life’s counterclaim, which seeks compensation for providing the extra benefits Chicago Pacific demands (and which Canada Life has been paying, pending resolution of the dispute). So, no thanks to Chicago Pacific — which has the responsibility to be aware of the decisions in its own reorganization, not to mention the duty of every party to inquire into the existence of federal jurisdiction before filing — we have jurisdiction and proceed to the merits.
 

 The district court granted summary judgment to Chicago Pacific. It concluded that Canada Life had promised to take over the payments required by the pension plan, and that if Canada Life neglected to ascertain what those were it had only itself to blame. That plan, the court believed, set $45 as a minimum payment.
 

 Our first question is whether Canada Life is required to adhere to any minimum figure for early retirees. The pension plan is clear on that score. Section 7.07 provides:
 

 Pension benefits payable to any retired Participant or the survivor of a joint and survivor option benefit provided for in this Plan shall in no event be less than $25 per month. No Participant shall be paid a pension in an amount which exceeds the lesser of the sum of $75,000 per annum or 100% of the Participant’s average compensation in the three Plan years in which he carried his highest compensation. Both minimum and maximum limitations shall be adjusted for increases in the cost of living in such amounts as may be determined by the United States Secretary of the Treasury or his delegate.
 

 No retiree may receive less than $25 per month. Section 7.07 does not say $25 per month at age 65, less a discount for early retirement; it says $25 per month. If Canada Life agreed to match the benefits payable under the plan, it agreed to a floor.
 

 The contract is contained in a letter, dated December 16, 1983, which Canada Life sent to the Rock Island’s trustee, and
 
 *337
 
 which both parties signed. This letter states in part:
 

 The group annuity contract shall provide benefits to annuitants that are at least equal to those benefits provided by the Rock Island Pension Plan, including the following:
 

 a. Normal retirement age 65.
 

 b. Normal Benefit forms of: life annuity; joint and survivor at 50%; joint and survivor at 67%; and joint and survivor at 100%.
 

 c. Early retirement is permitted at age 60, with an actuarially reduced benefit amount from the benefit otherwise payable at age 65. [Clauses (d) through (h) omitted.]
 

 Chicago Pacific emphasizes the introductory clause, in which Canada Life promises to pay benefits “at least equal” to those provided by the plan; Canada Life emphasizes clause (c), which speaks of an “actuarial reduction” from the benefits available at age 65.
 

 Clause (c) is not inconsistent with § 7.07. Everyone agrees that Canada Life may reduce benefits actuarially for early retirement. A pensioner entitled to a benefit of $100 per month at age 65 may be offered only $75 at age 60. The issue dividing the parties is not whether there may be an actuarial reduction, for § 7.02(b) of the plan itself provides for reductions, but whether Canada Life is bound to honor the floor § 7.07 places under the benefits. Clause (c) does not address that question. As we read the agreement, Canada Life was listing salient features of the pension plan, not modifying them; a paragraph promising to pay benefits “at least equal” to those in the plan is an odd place to modify the plan. The letter could have said that Canada Life promises to match the pension plan with exceptions, but it does not speak of exceptions.
 

 Another portion of the contract permits Canada Life to cash out any pension less than $25 per month. This shows, Canada Life says, that there may be reductions for early retirement. How else could there be pensions less than $25 per month?, it asks. Simple. The annuity, like the plan, provides for survivor benefits. A pensioner who elects to provide for his spouse after his death may choose a lower survivor’s rate (50% or 67%) in exchange for higher benefits during his life. A couple may choose a schedule that gives them, say, $40 per month during the pensioner’s life, and the survivor $20 per month for life. Canada Life’s option to tender a lump sum payment in lieu of these monthly checks does not show that the minimum benefit may be reduced on account of early retirement.
 

 Despite its promise to pay benefits “at least equal” to those under the pension plan, Canada Life protests that it never read the plan and therefore is not bound by it. According to Canada Life, it based the bid on pension schedules supplied by the Rock Island’s actuary and on the Rock Island’s payroll records, rather than on the terms of the plan. The mind boggles at the thought that an underwriter, contemplating an $8 million transaction, disdained the document whose terms it pledged to implement. Perhaps current payment schedules are more useful than legal documents to an actuary; we cannot exclude the possibility (though it taxes credulity) that it is prudent to push the documents away and make bids on some other basis. Canada Life’s methods of evaluating the cost of fulfilling its commitments are its own business and do not affect the entitlements of its trading partners.
 
 [1]
 
 A contracting party may not reduce its obligations by scrimping on reading time.
 

 Under Illinois law, which governs in this diversity case, the language of a contract binds the parties whether they read it or not,
 
 Comprehensive Accounting Corp. v. Rudell,
 
 760 F.2d 138 (7th Cir.1985) (Illinois law);
 
 Great American Federal Savings & Loan Ass’n v. Grivas,
 
 137 Ill.App.3d 267, 91 Ill.Dec. 870, 484 N.E.2d 429 (1st Dist.1985);
 
 In re Kloster,
 
 127 Ill.App.3d 583, 82 Ill.Dec. 847, 469 N.E.2d 381 (2d Dist.1984),
 
 *338
 
 and when a contract incorporates another document by reference, the incorporated document binds the parties whether or not they choose to read that either,
 
 Provident Federal Savings & Loan Ass’n v. Realty Centre, Ltd.,
 
 97 Ill.2d 187, 73 Ill.Dec. 389, 454 N.E.2d 249 (1983);
 
 Preski v. Warchol Construction Co.,
 
 111 Ill.App.3d 641, 67 Ill.Dec. 621, 444 N.E.2d 1105 (1st Dist.1982). Canada Life’s brief says that it never received a copy of the pension plan. This too is irrelevant,
 
 Electrical Workers v. Bradley,
 
 149 Ill.App.3d 193, 208, 102 Ill.Dec. 20, 499 N.E.2d 577, 587 (1st Dist.1986); if it had not received the document, it should not have promised to comply with its terms. At all events, affidavits from Chicago Pacific’s agents state that copies were provided; no affidavit from Canada Life denies receiving the plan. We may be looking at the “winner’s curse” — the winner in an auction may have submitted the
 
 winning
 
 bid only because it made a blunder that others avoided. Compare Richard Engelbrecht-Wiggins,
 
 An Introduction to the Theory of Bidding for a Single Object,
 
 in Auctions, Bidding, and Contracting: Uses and Theory 53, 85-93 (Engelbrecht-Wiggins, et al., eds. 1983) (describing the curse), with James C. Cox & R. Mark Isaac,
 
 In Search of the Winner’s Curse,
 
 22 Econ. Inquiry 579 (1984) (describing countermeasures). Bidders must take precautions against errors; neglect is not a reason to avoid a promise freely made.
 

 We come to the second principal issue: whether the minimum benefit is $25 or $45 per month. Section 7.07 of the plan says $25. In October 1983 — two months before Canada Life issued the annuity — the trustees of the pension plan voted to increase the minimum to $45 for those who started receiving benefits in the future. So much is undisputed, but the parties contest the effects of this vote. Chicago Pacific says that the increase is part of the plan that Canada Life promised to implement. Canada Life relies on § 9.01 of the plan:
 

 Although the Company intends to maintain this Plan in effect indefinitely, it nevertheless reserves the right to alter, amend, modify, revoke or terminate the Plan and any trust or other funding agreement that may be established to effectuate and implement the provisions of the Plan. Such action may be taken by appropriate action of the Trustees of the Property of Chicago, Rock Island and Pacific Railroad Company or by any corporate or other successor to him [sic] by executing a written instrument and filing the same with the Funding Agency and with the Board of Pensions....
 

 The trustees may have voted to change “$25” in § 7.07 to “$45”, Canada Life observes, but they did not execute an instrument to that effect or file anything with anyone. Someone investigating this plan would have seen only the $25 written in § 7.07. Canada Life is not in the best position to make this argument, for it insists that it never saw or relied on the plan, but Chicago Pacific is not in a terrific position either. Having lived by the terms of the plan (insisting that Canada Life follow § 7.07 rather than the actuary’s worksheets), Chicago Pacific may die by the terms of the plan.
 

 Now it is Chicago Pacific’s turn to try to escape the language of the plan. It says that Canada Life had actual notice of the trustees’ vote, so it cannot stand on technicalities, and in any event that the higher figure is not an alteration or amendment within the scope of § 9.01 but is instead just a cost of living increase, already authorized (nay, required) by the terms of § 7.07.
 

 Canada Life had actual notice of the trustees’ decision. Uncontradicted affidavits say that the information was passed along during the negotiations. Canada Life submitted to Chicago Pacific a computer printout showing, worker by worker, the monthly benefit payable at age 65 and the charge for that coverage. This printout shows no benefit less than $45 per month, at age 65, for annuitants who start receiving payments after January 1, 1984. The requirement of filing in § 9.01 may be designed solely for the benefit of those who lack actual knowledge of the trustees’ decisions. This is not, however, the ground on which Chicago Pacific defends the $45 minimum in this court. It contends that it is a cost-of-living increase, not an amendment.
 

 
 *339
 
 We doubt that there is a category of increases that do not amount to amendments of the plan. The filing requirement fixes the benefits due; people rely on the written word to determine legal obligations; a cost-of-living change is as significant to persons seeking to know the plan’s requirements as is any other alteration in the benefit amounts. If Canada Life had lacked actual knowledge of the trustees’ decision, it is hard to see how an unrecorded change in the payment schedules could have bound it. How else is an actuary to compute the price of the policy or determine the benefits due? It might be able to compute its obligations if the cost-of-living change were automatic; than all it would need to do is look up the figure in the plan, determine the change in a cost-of-living index since then, and pay the amount due. No one contends that the adjustment is automatic, however; the trustees made adjustment. To make matters worse, we cannot tell from this record whether the change from $25 to $45 reflects “increases in the cost of living in such amounts as may be determined by the United States Secretary of the Treasury or his delegate” (§ 7.07) between the adoption of the $25 minimum and October 1983; indeed, we cannot even tell from the record when the $25 minimum was adopted. Chicago Pacific’s brief boldly states (emphasis added):
 

 Provisions for cost of living adjustments are common place [sic ] in contemporary contracts and leases and do not require renegotiation or amendment when an adjustment is
 
 dictated
 
 by an
 
 agreed upon
 
 external standard such as a
 
 determination
 
 by the United States Secretary of the Treasury
 
 as is the case here.
 

 The brief does not cite the places in the record that support these propositions. Not a shred of evidence shows that the move from $25 to $45 was “dictated” by a change in the cost of living, that the Secretary of the Treasury made any “determination” on which the trustees relied, or even that the benchmark for the cost of living is “agreed upon”. The Secretary of the Treasury does not maintain any cost-of-living index; the plan refers to thin air.
 
 [2]
 
 The basis of the trustees’ decision is a mystery, so far as this record is concerned.
 

 This record is not capable of supporting summary judgment — at least not unless knowledge of the pension trustees’ decisions is as good as a formal amendment to the plan. On remand the district court should determine whether actual notice is sufficient, which may turn on inquiry into pension law (the Employee Retirement Income Security Act) and the customs of the industry. If actual notice suffices, the case ends at that point in Chicago Pacific’s favor. If actual notice is not enough, the district court must identify the appropriate cost-of-living index to use in adjusting the $25 minimum and decide whether the change in the cost of living supports the increase to $45.
 

 Vacated and Remanded.
 

 [1]
 

 . Indeed, we are surprised that a substantial firm would try to weasel out of its commitments by contending — even if true — that it neglected to read the documents it promised to implement. Is this the message Canada Life wants to send to future trading partners?
 

 [2]
 

 . The Consumer Price Index for urban consumers (the best known "cost-of-living" index) is maintained by the Department of Labor’s Bureau of Labor Statistics; the GNP price deflator, a standard measure of inflation (which is not the same thing as changes in the “cost of living”, a measure that includes changes in consumers’ purchasing patterns) is maintained by the Department of Commerce’s Bureau of Economic Analysis — which also computes a personal consumption expenditures price deflator, using a different methodology. The Department of the Treasury does not maintain any pertinent index. We cannot patch things, up by reading any particular index into the plan, for different indices yield substantially different results. See Alan S. Blinder,
 
 The Consumer Price Index and the Measurement of Recent Inflation,
 
 2 Brookings Papers on Economic Activity 539 (1980). The consumer price index also is altered from time to time in order to reflect changes in the goods consumers purchase, e.g., John L. Marcoot & Richard C. Bahr,
 
 The revised Consumer Price Index: changes in definitions and availability,
 
 Monthly Labor Review 15 (July 1986), while the personal consumption expenditures price deflator is adjusted constantly by a weighting formula. The Statistical Abstract of the United States 407, 443-46 (1988) shows some of the differences and changes.