ANTTI KANGAS, d/b/a Kangas Construction Company, Plaintiff-Appellant, *v.* ANTHONY TRUST *et al.*, Defendants-Appellees.

Second District   No. 81—903

Opinion filed October 27, 1982.

Robert M. Bollman and Newton E. Finn, both of Diver, Bollman, Grach & Quade, of Waukegan, for appellant.

Conzelman, Schultz, Snarski & Muller, of Waukegan, for appellees.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Antti Kangas, d/b/a Kangas Construction Company, appeals from a judgment denying recovery under his suit for a mechanic's lien, and awarding the homeowners, Anthony Trust and Madeline Trust, his wife, $25,155.21 on their counterclaim. On appeal Kangas does not challenge the dismissal of his lien claim but contends that several items were improperly included in the damages awarded.

On November 7, 1977, the Trusts contracted with Kangas for construction of a duplex house on property owned by the Trusts. Mrs.

Trust testified that it was intended as a home that they planned to live in as a retirement home with an apartment for her parents. The original contract price was $132,496 payable in two installments, the first due when the house was under roof and the balance when the house was completed to the Trusts' satisfaction; with extras, the price by later agreement was $144,482.60. The house was to be completed within 120 days from the ground breaking.

The house was under roof in January 1978 when problems developed. The asphalt roof shingles would not flatten out because workmen placed the shingles over accumulated ice and snow; and the roof sagged because the rafters were set at different levels. According to Mrs. Trust, Kangas told her that the shingles would flatten out in the summer heat, but they never did.

At trial, workmen who inspected and did repairs testified to other construction problems which indicated that work done by Kangas was not good and workmanlike. The entire house was "out of plumb." The exterior walls leaned out 1½ inches; the floor tilted down 2½ inches; the house sagged because the center beam in the basement was not level; the heating and air conditioning ducts were crooked and the standard fittings were nonexistent. The floor joist was single rather than double as called for in the contract, and the upstairs and downstairs floor joists had been reversed; as a result the joists ran in opposite directions and there was no bearing wall to support the second floor, which sagged.

A particular item challenged on appeal is the basement floor, which was poured at least four inches higher than called for in the contract. Ken Olson, the architectural designer who had drawn up the plans, testified that the basement walls were poured 4½ inches too short and the only way to conform to the contract would have been to dig out the foundation and excavate further. He admitted that he was on the site when the floor was poured but denied the Trusts had authorized the basement floor at the level of seven foot six inches rather than seven foot 10 inches specified in the contract. The actual height variance from the plans was never definitely established. According to Kangas, from footing to the top of the foundation the height was seven foot six inches with a two-by-six plate on top of the concrete adding 1½ inches. According to Olson, the variance was originally 6½ inches, but ended up 4½ inches after the concrete on the footing was depressed two inches. In his reply to the Trusts' counterclaim, Kangas admitted that the basement height was four inches shorter than specified in the plan.

The Trusts terminated the contract with Kangas in October 1978,

and contracted with Olson to correct and complete construction. Olson said that his repairs, including installation of a new cedar roof, were done in the least expensive way and cost $45,000. The Trusts sold the house and lot together for $155,000.

In its judgment order the trial judge computed damages:

"[The parties] have made the following expenditures, had the following losses or would have had to expend the following sums to build, finish or correct the building ***:

| | |
|---|---:|
| Kangas | $ 63,000.00 |
| Olson (Construction) | 45,000.00 |
| Olson (Inspection) | 1,162.50 |
| Items admitted by Kangas | 1,710.00 |
| Glue | 66.00 |
| Air Comfort | 5,510.00 |
| Blacktop | 1,600.00 |
| Rough Grading | 1,126.42 |
| Painting | 2,150.00 |
| Value of Lot | 35,000.00 |
| Carpet Allowance | 2,976.00 |
| Fence Replacement | 267.09 |
| Wallpaper | 477.20 |
| Brick above window | 2,860.00 |
| Lowering of basement floor | 20,000.00 |
| | $182,905.21 |

That there should be deducted from the above the sum of $2,750.00 being one-half of the cost of finishing part of the basement and $155,000.00 being the price for which Defendants sold the premises in question."

The judge expressed additional findings that time was intended to be of the essence of the contract; that Kangas substantially breached the contract by not completing it within time; that there was bad workmanship, and that in various instances there was a "total failure to look at the plans and specifications." He also found that the roof was done in an unworkmanlike manner with no effort to cure the defective construction; that the basement height provided in the contract "was important to the Trusts"; that Kangas "didn't pay any attention to the plans and specifications" as to the basement height, and that by Kangas' own testimony he "built it the way he usually builds a house."

### 1. The Roof

■ Both parties agree that as to the roof the cost or remedying the defect is the proper rule of damages. (See *Park v. Sohn* (1982), 89 Ill. 2d 453, 464.) A witness for Kangas testified that new shingles could have been nailed over the rippled shingles for $4,000 but did not estimate the cost of correcting the uneven rafters underlying the shingles. Olson, testifying for the Trusts, said that the repairmen "would have had to have taken the roof apart in certain areas, rebuilt it, eliminated all the shingles that were on the roof at the time, and re-shingled it." In Olson's opinion, the cedar shakes roof was less expensive than insisting on full performance requiring the roof to be rebuilt. In oral argument Kangas has conceded that the cedar roof was the less expensive method of remedying the roof defects, but he further contends, citing *St. Joseph Hospital v. Corbetta Construction Co.* (1974), 21 Ill. App. 3d 925, that the Trusts were unjustly enriched by installation of a higher grade roof over the defective shingles. On this question of fact the judge chose to believe Olson; and his award of the installation cost of the cedar shakes as a remedy for the defect is not against the manifest weight of the evidence.

*St. Joseph Hospital v. Corbetta Construction Co.* (1974), 21 Ill. App. 3d 925, is distinguishable. The court held that the hospital (owner) was not entitled to indemnity from the contractor for the extra cost of installing a more expensive fire retardant paneling, which the local building code required, where the hospital's architect (an "exclusive agent") failed to specify the more expensive paneling, approved initial installation of the less retardant paneling, and performance by the general contractor was good and workmanlike. By contrast, the trial court here found that Kangas had breached the contract by failing to construct the roof in a good, workmanlike manner, and the owners stand blameless.

The Trusts received a better roof than they contracted for only because Kangas made the cheaper roof more costly to rebuild.

The trial court did not err in refusing to grant a setoff to Kangas of $22,384 which represented the increased costs of installing the cedar shake shingles over reshingling the defective roof.

### 2. The Basement

The plans called for the height of the basement to be seven feet 10 inches. Prior to entering into the contract Mrs. Trust had pointed out to Kangas the basement in her previous house which had this admittedly high basement. There was evidence that the basement walls had been poured short before either the Trusts or Olson had seen the

construction. When Olson first noticed the variance from the plans he said he told Kangas that the basement walls were poured too short but Kangas merely said it was his standard height. Olson suggested that they could "buy" two inches of ceiling height by lowering the floor, laying two inches of concrete and gravel base over the footing instead of the four inches called for by the plans. He said the only alternative at that time would have been to excavate, destroy one foundation wall, remove the footing and lower the floor the necessary amount. He said at that time this would have cost between $18,000 and $20,000.

### a. Equitable Estoppel

Under these facts we are not persuaded by Kangas' argument that the Trusts were equitably estopped by the agreement of Olson, found to be their agent, to go ahead with the pouring of the basement floor. At that time the basement walls were already 4½ inches too short and the ceiling would have been 6½ inches shorter than the contract called for except for Olson's agreement to lower the floor by diminishing the base material, ending up with a seven foot six inch ceiling height instead of the seven foot 10 inches called for in the contract. The cost to repair at that time could not have been changed by Olson's assent to the partial cure. True, there was testimony that the cost of repair would have been $26,800 when Kangas left the job, but the court did not award damages on this basis.

For a voluntary acceptance of defective performance to work a complete discharge, the acceptance must be absolute and unconditional (*Broncata v. Timbercrest Estates, Inc.* (1968), 100 Ill. App. 2d 49, 54), based on facts and circumstances indicating that the owner intentionally relinquished a known right (*Lempera v. Karner* (1979), 79 Ill. App. 3d 221, 223). The acts relied on by the party in breach must be inconsistent with an intention by the injured party to insist on rights to performance under the contract. (*John Kubinski & Sons, Inc. v. Dockside Development Corp.* (1975), 33 Ill. App. 3d 1015, 1020.) The mere receipt of defective performance does not discharge a claim for damages for the breach. (Corbin, Contracts sec. 1245, at 1000 (1952).) There must also be an expression of assent to accept defective performance in satisfaction and as a complete discharge. (Restatement of Contracts sec. 411 (1932); Restatement (Second) of Contracts sec. 277(2) (1981).) Assent is required because defective performance alone cannot discharge the duty to perform; the discharge is effected solely by the expression of assent to discharge. (Corbin, Contracts sec. 1245, at 1000 (1981).) The burden of proving

acceptance is on the party pleading it. (*Intaglio Service Corp. v. J. L. Williams & Co.* (1981), 95 Ill. App. 3d 708, 714.) We conclude that the Trusts did not accept the defective performance.

### b. Measure of Damages

There are various formulas which may be applied in fixing damages in building construction cases, as the trial court properly noted, but the circumstances dictate the method to be used. Kangas argues that the proper formula here is to determine the amount the fair market value of the house was diminished by the failure to follow the plans and that since the Trusts presented no evidence to show any diminution in value when they sold the house without changing the basement they were not entitled to be credited with the $20,000 awarded.

Kangas relies principally on language in *Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, to support his position. In *Brewer*, the trial court awarded $7,500 in damages for defects in the work based on diminution in the value of the house.

The appellate court noted that although the contractor's performance of his agreement was less than substantial the builder's omissions of performance, a number of unspecified interior defects, "would involve a substantial tearing down and rebuilding of the structure" and "to avoid economic waste the measure of damages is not the cost of repair, but rather is the difference in value ***." 42 Ill. App. 3d 668, 679; see also *Mayfield v. Swafford* (1982), 106 Ill. App. 3d 610, 614.

We do not believe that the circumstances of this case appropriately call for application of the diminution in value rule. Granted, the cost of remedying the defect is substantial, but it is evident that the damage arose from a wilful violation of the building contract. The trial court found as a fact that failure to conform was because Kangas "didn't pay any attention to the plans and specifications," and "built it the way he usually builds a house." Mrs. Trust wanted a seven foot 10 inch ceiling in the basement of the duplex that she then intended to live in as a retirement home, which would contain an apartment for her parents; she showed Kangas a basement with that height in her previous house; she particularly expressed her desire that the height be the same in her new home and pointed out the 12-inch I beams; and she specified it in the plans. On the record we cannot say the four- to 4½ inch variance was trivial, but conclude that the basement height was of "special value" to Mrs. Trust. *Cf.* Restatement (Second) of Contracts sec. 348, illust. 4 (1981).

The cases in Illinois which have been cited and which we have seen do not involve a wilful violation of the contract by a builder.

Cases in other jurisdictions, however, have directly confronted this issue and appear to have qualified the diminution of value rule by holding that it applies only if the breach is not wilful. (See *Shell v. Schmidt* (1958), 164 Cal. App. 2d 350, 359, 363, 330 P.2d 817, 823, 825-26, *cert. denied* (1959), 359 U.S. 959, 3 L. Ed. 2d 766, 79 S. Ct. 799; *Hourihan v. Grossman Holdings Ltd.* (Fla. App. 1981), 396 So. 2d 753, 755; *American Standard, Inc. v. Schectman* (1981), 80 A.D.2d 318, 322-23, 439 N.Y.S.2d 529, 532-33. See generally Annot., 76 A.L.R.2d 805, 825-26 (1961).) It has also been recognized that awarding damages equal to the amount required to reconstruct the dwelling so as to make it conform to the specifications is proper when the contract is one to construct a dwelling for the owner who plans to live in it as distinguished from a commercial structure "where the aesthetic taste of the owner is not so deeply involved." *Fox v. Webb* (1958), 268 Ala. 111, 119, 105 So. 2d 75, 82-83; *Carter v. Quick* (1978), 263 Ark. 202, 209, 563 S.W.2d 461, 465.

We, however, do not conclude that every wilful breach requires that the cost of repair be automatically used as the measure of damages. Obviously, every variation from specifications does not mandate this result. If the builder does not perform in the manner called for in the contract, but in good faith, although intentionally, does something equally as good he should not be required to pay for substantial repairs. (See 3A Corbin, Contracts sec. 707, at 330 (1960).) Otherwise, the penalty and forfeiture, with no real damage to the owner, may be grossly disproportionate to the nature of the breach. (5 Corbin, Contracts sec. 707, at 331 (1960).) But we agree with Corbin that where the variance from the contract does not result in a lesser market value than would result from exact performance, it may still be less than substantial performance; and that under that circumstance the wilful violation of the contract by the builder is a factor which may be considered by the trier of fact in determining whether the breach requires application of cost of repair or diminution in value as the measure of damages. (5 Corbin, Contracts sec. 1089, at 491 (1964).) We also conclude that in addition to the determination of wilfulness, the owner's purpose in constructing a dwelling for his own use and therefore to his own tastes is also a factor to be considered. *Fox v. Webb* (1958), 268 Ala. 111, 119, 105 So. 2d 75, 82-83; *Carter v. Quick* (1978), 263 Ark. 202, 209, 563 S.W.2d 461, 465.

■ We hold that the trial court's resolution of the measure of damages and the amount was proper on this record.

### 3. Value of the Vacant Lot

■ Kangas finally argues that the trial court improperly included the value of the lot, $35,000, in computing damages. We do not agree. The trial judge included the lot as an item in adding up the Trusts' costs before subtracting from this sum ($182,905.21) the sales proceeds of the house and lot together ($155,000). This sales price was unallocated between the house and lot. The court properly included the lot since the lot had been included in the sale. Kangas was not prejudiced thereby in computing damages since the same result is reached if the lot is excluded both from the cost of completion ($147,905.21) and the sales proceeds of the house alone ($120,000). The value of the lot on either side of the equation cancelled each other out.

The judgment of the circuit court of Lake County is therefore affirmed.

Affirmed.

NASH and HOPF, JJ., concur.