STEVE L. SHAW *et al.*, d/b/a Shaw Brothers Packing Company, Plaintiffs-Appellees, v. BRIDGES-GALLAGHER, INC., Defendant-Appellant.

Fifth District   No. 5—87—0542

Opinion filed September 7, 1988.

682

Mike Reed, of Crain, Cooksey & Veltman, Ltd., of Centralia, for appellant.

Stanley R. Smith, of Albion, for appellees.

JUSTICE CALVO delivered the opinion of the court:

Plaintiffs, Steve and Charles Shaw as partners in the Shaw Brothers Packing Company, and defendant, contractor Bridges-Gallagher, Inc., entered into a contract for the construction of a slaughter and meat processing plant. Defendant then hired a subcontractor, McDevitt Roofing, to install the roof of the plant. Defendant completed construction of the plant in 1980, but the roof subsequently leaked. Plaintiffs filed suit against defendant to recover the cost to replace the roof. After a bench trial, the court awarded plaintiffs $18,250. On appeal, defendant argues that the amount of damages awarded to plaintiffs was improper. Defendant presents three issues: (1) whether plaintiffs presented sufficient evidence to establish a proper basis for computing damages; (2) whether the damages awarded to plaintiffs must be reduced to reflect the use and benefit plaintiffs received from the roof; and (3) whether defendant established its defenses of waiver and estoppel, thereby precluding judgment for plaintiffs. For the reasons set forth below, we affirm the judgment of the trial court.

The parties do not dispute that the roof as installed did not comply with the specifications in the contract. The contract provided for a flat roof with two layers of one-inch thick fiberboard covered with tar and tarpaper made from asbestos. The roof as constructed contained two layers of three-quarter inch fiberboard covered by tar and tarpaper made from organic materials. The price for the roof specified in the contract was $7,959. The parties, through their various expert witnesses, provided four widely varying estimates of the cost to rem-

edy the defects in the roof. Ralph Knigge, defendant's expert, testified that the roof could be patched and retarred for a cost of about $1,400. Knigge also testified that it would cost $10,586 to install a new roof over the existing roof. Plaintiffs' expert, Ralph Shelton, testified that the cost to remove the existing roof and construct a new roof would be $19,000. Shelton also testified, however, that the cost to build a new roof over the existing roof would be approximately $16,500 or $17,000. The court awarded plaintiffs $18,250, but did not specify what this amount included. The record and the parties indicate that the trial court's award probably included $17,000, as testified to by Shelton, for repairing the roof, and $1,250, also testified to by Shelton, for designing the new plans to construct the new roof.

Defendant contends that the trial court should have awarded damages based on the difference in value between the roof specified in the contract and the roof actually constructed. Because plaintiffs did not present any evidence on the value of the roof actually constructed, defendant argues that plaintiffs can only recover nominal damages. Defendant also argues that Shelton's testimony consisted of mere speculation, and thus did not provide a sufficient basis for an award of damages.

■ When a builder has provided less than full performance, the correct amount of damages is the cost of correcting the defective condition. (*Park v. Sohn* (1982), 89 Ill. 2d 453, 464, 433 N.E.2d 651, 657; *Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 674, 356 N.E.2d 565, 570.) "If, however, the defects could be corrected only at a cost unreasonably disproportionate to the benefit to the purchaser, or if correcting them would entail unreasonable destruction of the builder's work," the measure of damages then should be the difference between the value of full performance of the contract and the value of performance actually received or, in other words, the amount by which the defects have reduced the value of the property. *Park*, 89 Ill. 2d at 464-65, 433 N.E.2d at 657; *Brewer*, 42 Ill. App. 3d at 674, 356 N.E.2d at 570.

■ We hold that the trial court correctly awarded damages on the basis of the cost to repair the roof, rather than the diminution in value of the roof specified in the contract. Correcting the defects would not involve unreasonable destruction of defendant's work inasmuch as the new roof would be constructed over the old one. Moreover, no one testified that the construction of the new roof would in any way harm the rest of the building. Defendant argues, however, that the cost of replacing the roof would be unreasonably disproportionate to the benefit received by plaintiffs because the roof specified

in the contract only cost $7,959, while the new roof would cost $17,000. Plaintiffs, on the other hand, contend that the cost to repair the roof in 1987 is not disproportionate if that cost is compared to the $504,989 construction price of the entire building. Plaintiffs also point out that the price of the roof and the building in the contract were determined in 1980, while the cost to repair or replace the roof was determined in 1987. We agree with plaintiffs that the cost to repair the roof is not disproportionate considering the value of the building as a whole. In addition, the contract price of the roof cannot be accurately compared to cost to replace the roof inasmuch as those two figures represent values seven years apart, and inasmuch as the cost to repair a roof would naturally be more in 1987 than in 1980 due to inflation.

We find *Witty v. C. Casey Homes, Inc.* (1981), 102 Ill. App. 3d 619, 430 N.E.2d 191, which defendant cites for support, distinguishable from the case at bar. The *Witty* court found that the correct measure of damages in that case was the diminution of value of the building caused by the defect. In *Witty*, the building contractors used a different kind of brick than was called for in the contract. The court found that the cost-of-repair method for computing damages would be improper because the $50,000 cost to replace the brick would be grossly disproportionate to the $54,566 cost of the building and because replacing the brick would seriously damage other parts of the building. As we have said, in the case at bar, repairing the roof would not harm the rest of the building and would not be grossly disproportionate to the cost of the building or the original cost of the roof. Thus, the trial court properly determined that the appropriate measure of damages was the cost to repair the roof.

■ Defendant also contends that the trial court improperly based its award of damages on an expert's speculation. A trial court's assessment of damages will not be overturned unless it is against the manifest weight of the evidence. (*Pathman Construction Co. v. Hi-Way Electric Co.* (1978), 65 Ill. App. 3d 480, 490, 382 N.E.2d 453, 461; *Society of Mount Carmel v. Fox* (1980), 90 Ill. App. 3d 537, 543, 413 N.E.2d 480, 485.) That assessment "may be upheld if it falls within the range of estimates given by expert witnesses." (*Society*, 90 Ill. App. 3d at 543, 413 N.E.2d at 485.) "Absolute certainty as to the amount of damages is not required" (*Society*, 90 Ill. App. 3d at 543, 413 N.E.2d at 485), and "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability" (*Posner v. Davis* (1979), 76 Ill. App. 3d 638, 645, 395 N.E.2d 133, 138). Damages, however, cannot be based on mere speculation or con-

jecture. *Posner*, 76 Ill. App. 3d at 645, 395 N.E.2d at 138.

■ We hold that Shelton's testimony provided a sufficient basis for the court's award of damages. Shelton testified, "If I were to have my company come in and bid the roof ***, I would first off have to give an offhand guess because I'd—I'd have to get the pencil and paper out and get very accurate to give the bid but an educated guess would be between sixteen five and $17,000.00." Defendant argues that this testimony proves that Shelton's estimate was no more than a guess. Shelton, however, qualified as an expert in roof repair, having had six years of experience in the area. He examined or repaired plaintiffs' roof five different times between 1983 and 1986, so he was quite familiar with the particular roof in question. George Ridgway testified as to how the new roof could be constructed over the old roof. Although Shelton based his estimate on Ridgway's design of how the repair would be performed, Shelton was present in court and heard Ridgway's testimony. Having worked in the Edwards County area, Shelton was familiar with the costs of labor and materials in that area. In addition, Shelton's estimate only allowed for a $500 deviation.

The evidence presented at trial also revealed that merely patching the roof would not solve the leakage problem. Shelton testified that the insulation was too thin so the field of the roof sat lower than the scuppers which provided drainage off of the roof; thus, the water on the roof could not drain properly. Furthermore, Knigge's estimate of $10,586 may have been too low. Knigge testified that he obtained that price from a union contractor in St. Louis, Missouri. Knigge admitted that the price did not include the cost of having the laborers come to Albion, Illinois, located on the southeast side of the State, to perform the work.

Consequently, we believe plaintiffs proved their damages with reasonable certainty. (*Pathman*, 65 Ill. App. 3d at 487, 382 N.E.2d at 459.) We also note that, contrary to defendant's argument, *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.* (7th Cir. 1986), 797 F.2d 370, is distinguishable on its facts. For all of these reasons, we cannot say that the trial court's reliance on Shelton's testimony regarding the cost to repair the roof was erroneous or against the manifest weight of the evidence.

Defendant points out that Shelton testified twice concerning the cost to repair the roof. When defendant moved to strike the testimony, the trial court granted defendant's motion. The trial began on October 29, 1986, and resumed on January 28, 1987. Shelton testified on both days, but only his testimony on January 28 was stricken.

Defendant admitted that on October 29 it did not make a motion to strike Shelton's testimony. Although defendant contends that it would have made such a motion if it had realized that Shelton's earlier testimony was responsive and more than a guess, defendant did not make such a motion and therefore waived its objection. Thus, Shelton's earlier testimony was not stricken and could have provided a basis on which the court could assess damages.

■ Defendant's second contention is that plaintiffs' award should be reduced to reflect the benefit they received from the use of the roof as installed. Knigge testified that the roof specified in the contract had a useful life of between 10 and 15 years, while Shelton testified that it had a useful life of 15 years. Knigge testified that the roof as installed had a useful life of nine years. Defendant draws two alternate conclusions from this evidence. Defendant argues that plaintiffs began occupying the building in 1981; thus, plaintiffs had the benefit of the roof for at least six years. If a new roof is put on, plaintiffs would get a windfall, according to defendant, because they would get the full useful life of a new roof plus six years of the old roof's usefulness, and they only contracted for a roof with a useful life of 15 years. Defendant thus implies that plaintiffs' damages should be reduced to at least reflect the six years of use they derived from the roof. Defendant, however, explicitly asks that the award be reduced by the value of the full nine-year life of the roof as constructed. Because plaintiffs contracted for a roof that would last 15 years, and because the roof as installed had a useful life of nine years, which plaintiffs would cut short if they installed the new roof, defendant contends that plaintiffs' award should be reduced to reflect the expiration of 9/15 of the useful life of the new roof. The trial court did not detail the reasons for its award of damages, so it is unclear whether the court reduced the award to account for plaintiffs' actual use of the roof or the full useful life of the roof. The parties indicate in their briefs, however, that the court did not reduce the award to account for the actual use or useful life concept.

The only case defendant cites for support is *Central Illinois Light Co. v. Stenzel* (1963), 44 Ill. App. 2d 388, 195 N.E.2d 207, which we find distinguishable. In *Stenzel*, a driver of a truck ran off the road and hit a telephone pole belonging to the plaintiff. The pole broke, brought down power lines and caused damage. The evidence at trial revealed that the pole had an average useful life of 33 years and was 15 years old at the time of the collision. Taking the age and useful life of the pole into account, the court awarded the plaintiffs 45% of the material costs necessary to make the repairs. *Stenzel*, unlike the case

at bar, did not involve a building contract and the pole apparently encountered no problems until the collision.

We cannot find any statutory or common law authority in Illinois for defendant's actual use or useful life concept as it applies to the assessment of damages in the breach of building construction contracts, and we decline to adopt the concepts. The actual use and useful life concepts, as they apply to building construction contracts, are just variations of the diminution of value concept discussed earlier. Subtracting the useful life of the roof actually installed from the value of the new roof is simply another way to reduce the damage award to reflect the value of the roof installed. We pointed out earlier that the law in Illinois is that an injured party can recover the cost to remedy a defective condition. The injured party will only recover the difference between the value of the actual performance and the value of the performance as specified in the contract, if the repair would cause unreasonable destruction to the builder's work or would result in a benefit to the purchaser disproportionate to its cost. We also agree with plaintiffs that even if courts only allowed defendants to reduce damages by the value of the time plaintiffs actually used the building, this would just encourage defendants to delay repairs and to delay settlements of suits, because the longer plaintiffs used their buildings, the more defendants could deduct from the damage awards. We have already held that the correct measure of damages in the case at bar is the cost to repair the defects and we decline to modify that holding.

The last issue defendant presents for review concerns waiver and estoppel. Defendant argues that plaintiffs knew about the defective materials used in constructing the roof and the improper installation of the roof and accepted both. Alternatively, defendant contends that plaintiffs should have known that the roofing subcontractor used the wrong materials and installed the roof incorrectly, because, according to the contract, plaintiffs should have received written assurances from the subcontractor that it used the proper materials. Thus, according to defendant, plaintiffs waived any objection and are estopped from asserting any claim they have against defendant for the defects in the roof.

Defendant draws our attention to the testimony of its site foreman, Clayton Ferrell. Ferrell testified that he told plaintiffs that the roof had blisters and that the insulation was only three-fourths of an inch thick. Ferrell stated that plaintiffs told him not to worry about it and that plaintiffs knew of and approved the deviations in the construction of the roof. Charles Shaw testified that neither Ferrell nor anyone else told him during the construction of the roof about blisters

in the roof or about the insufficient insulation. Defendant also points out that plaintiffs actually helped install the roof, and thus they were in a position to know whether the subcontractor used defective products and procedures. Shaw testified, however, that he only provided physical labor on the job when a strike left defendant short of laborers. Shaw admitted that he had no knowledge of or experience in the installation of roofs, and in fact he relied on the expertise of Ferrell in making decisions concerning the construction of the building. Plaintiffs, therefore, contend that they could not have waived the defects in the roof because Ferrell did not tell them defective materials were being used, and because they did not have sufficient knowledge about roofing to notice that the roof was not being installed properly, even though they were present during the construction of the roof.

Defendant also argues that plaintiffs had a duty to know whether the subcontractors used the correct materials. The specifications provided that "[t]he roofing contractor shall confirm, through a written letter to the Engineer, the insulation, roofing and flashing system used." Plaintiffs do not deny that they acted as the engineer for the construction of the roof. The parties did not present any evidence that the roofing subcontractor provided written confirmation to plaintiffs of the materials used, and the parties agree in their briefs that plaintiffs received no such confirmation. Defendant contends that if plaintiffs would have insisted on these assurances from the roofing subcontractor, plaintiffs would have known of the defects. Thus, as the engineer, plaintiffs did not fulfill their duty and should be estopped from asserting a claim against defendant for defects that plaintiffs were responsible for discovering.

■ An absolute and unconditional acceptance of the work can act as a waiver or acceptance of defective performance. (*Intaglio Service Corp. v. J. L. Williams & Co.* (1981), 95 Ill. App. 3d 708, 714, 420 N.E.2d 634, 639; *Kangas v. Trust* (1982), 110 Ill. App. 3d 876, 881, 441 N.E.2d 1271, 1275.) In order for there to be a waiver, however, the facts must indicate that the injured party intentionally relinquished a known right, and the injured party cannot relinquish that right unless he or she knows or has reason to know of the defective condition. (*Intaglio*, 95 Ill. App. 3d at 714, 420 N.E.2d at 639; *Kangas*, 110 Ill. App. 3d at 881, 441 N.E.2d at 1275.) Moreover, "[t]he acts relied on by the party in breach must be inconsistent with an intention by the injured party to insist on rights to performance under the contract." (*Kangas*, 110 Ill. App. 3d at 881, 441 N.E.2d at 1275.) The injured party must also express "assent to accept defective performance in satisfaction and as a complete discharge." (*Kangas*,

110 Ill. App. 3d at 881, 441 N.E.2d at 1275.) The party pleading waiver has the burden to prove it. *Intaglio*, 95 Ill. App. 3d at 714, 420 N.E.2d at 639.

The trial court in the case at bar could have found that plaintiffs did not waive any objections they had to the defects in the roof. This issue comes down to a conflict in the evidence. Instead of believing defendant's evidence, the trial court could have chosen to believe Shaw's testimony that Ferrell did not tell him about the defects, that Shaw had no knowledge of roofing, and that Shaw only served as a physical laborer on the construction site. Although plaintiffs may have accepted the roof and paid for it, their acceptance does not amount to waiver unless they knew about the defects. Based on plaintiffs' evidence concerning their actions during and after construction of the roof, the trial court could have properly found that, at the time plaintiffs accepted the roof, plaintiffs did not know that the subcontractor used defective materials, plaintiffs did not accept the defective materials, and thus plaintiffs did not waive any claims they had against defendant for the use of the defective materials.

Rather than lending merit to defendant's argument, we believe *Saverslak v. Davis-Cleaver Produce Co.* (7th Cir. 1979), 606 F.2d 208, which defendant cites, supports plaintiffs' position. In *Saverslak*, the plaintiff developed a process for the production of turkey rolls. Plaintiff entered into a 20-year contract with the defendant whereby plaintiff licensed its patent rights and trade secrets to the defendant for production of the turkey rolls and defendant would pay plaintiff a royalty for each pound of turkey sold. One of the contract provisions required the defendant to put plaintiff's trademark on the labels of the turkey rolls. Four years into the contract the defendant eliminated the trademark from its labels. The evidence clearly indicated that the plaintiff knew of this breach and did not seek to enforce this provision in the contract until seven years later. The court held that because plaintiff knew of the breach and did not object to it, plaintiff waived his rights under the contract. The court also held that even if plaintiff did not waive his rights, he was estopped from enforcing them because his silent acquiescence of the royalties in face of the breach led defendant to believe that that provision in the contract would not be enforced.

The *Saverslak* court held that waiver involves an intentional relinquishment of a known right. (*Saverslak*, 606 F.2d at 213.) Although the plaintiff in *Saverslak* knew of the breach, plaintiffs in the case at bar did not know of the breach so plaintiffs did not waive their rights. Likewise, plaintiffs' actions in the case at bar did not es-

top them from enforcing the contract. Estoppel arises when a party's conduct induces another to believe that a right will not be enforced and the latter detrimentally relies and acts on this representation. (*Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87, 95-96, 473 N.E.2d 548, 555; *Saverslak*, 606 F.2d at 213.) In *Saverslak*, defendant's reliance on plaintiff's silent acquiescence resulted in harm to defendant, because if plaintiff had informed defendant that he would insist on strict compliance with the contract, defendant could have remedied the breach much sooner by adding the trademark to the labels, thereby minimizing its damages for breach of contract.

■ On the other hand, in the case at bar, defendant did not rely to its detriment on any act of the plaintiffs. If the trial court believed plaintiffs' testimony, rather than Ferrell's, that plaintiffs did not know of the defective materials or installation and that they had no knowledge of roofing, then plaintiffs did not do anything to indicate that they would not insist on compliance with the contract. Thus, plaintiffs did not perform any act on which defendant could detrimentally rely. Plaintiffs' payment for and acceptance of the roof after the completion of its construction also would not estop them from asserting their rights, because defendant did not suffer any harm by relying on that acceptance. The only way defendant could have detrimentally relied on plaintiffs' acceptance was if plaintiffs accepted the defective materials during construction of the roof, and defendant, relying on this acceptance, proceeded to construct the roof with those materials. Defendant would have suffered harm from relying on plaintiffs' acceptance at this point, because during construction defendant could have easily remedied the breach by using the correct materials. After the roof was completed, however, defendant could not do anything to change its performance, and thus it did not suffer any harm by relying on plaintiffs' acceptance upon completion of the roof. As we have indicated, the trial court chose to believe plaintiffs' testimony that they did not tell Ferrell that the substituted materials were sufficient. Thus, defendant could not have detrimentally relied on any act of the plaintiffs either during or after construction.

■ Moreover, plaintiffs' actions as engineer did not estop them from asserting a claim against defendant. The specification defendant quotes put a duty on the roofing subcontractor to supply written confirmation of the materials used in installing the roof. Thus, rather than establishing an obligation on the engineer, the specification put an obligation on the roofing subcontractor. The specification merely stated that the roofing subcontractor was to write a letter to the engineer confirming the materials used in the project. The specification

did not specifically put any responsibility on the engineer. Although plaintiffs, as engineer, should have been more aware of how the roof was being installed, we do not believe the specification contractually required them to oversee the roofing subcontractor's construction of the roof. Moreover, article 10 of the contract provided:

"The Contractor shall supervise and direct the Work, using his best skill and attention and he shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract.

\* \* \*

The Contractor warrants to the Owner and the Architect that all materials and equipment incorporated in the Work will be new unless otherwise specified, and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not conforming to these requirements may be considered defective.

\* \* \*

The Contractor shall be responsible to the Owner for the acts and omissions of his employees, Subcontractors and their agents and employees, and other persons performing any of the Work under a contract with the Contractor."

Therefore, according to the parties' contract, defendant agreed to assume responsibility for any work not conforming to the specifications and for all acts or omissions of its subcontractors, including the roofing subcontractor. The roofing subcontractor's failure to provide the plaintiffs with written confirmation of the materials it used was thus an error ultimately attributable to defendant. The lack of confirmation in no way shifted the responsibility for the defective roof from the defendant to plaintiffs. Consequently, plaintiffs' actions during the construction of the roof did not estop them from succeeding in a cause of action against defendant.

For the reasons set forth above, we affirm the decision of the circuit court of Edwards County.

Affirmed.

HARRISON, P.J., and LEWIS, J., concur.