C-B REALTY AND TRADING CORPORATION *et al.*, Plaintiffs-Appellants,
v. CHICAGO AND NORTH WESTERN RAILWAY COMPANY *et al.*,
Defendants-Appellees.

First District (4th Division)   No. 1—96—1344

Opinion filed June 26, 1997.—Rehearing denied August 4, 1997.

French, Kezelis & Kominiarek, P.C., of Chicago (Algimantas Kezelis, Michael R. Webber, and Julie A. Neidhardt, of counsel), for appellants.

Thomas W. Cushing and George H. Brant, both of Chicago, for appellees.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

This case possesses a Dickensian quality. It concerns a contract entered into in 1908 and a lawsuit filed in 1974. Unfortunately, this decision probably will not put an end to the dispute.

We are called on to decide what the parties to the contract meant when they agreed to a "watertight" floor for a railroad bridge (they meant watertight) and we must decide a dispute over who is to pay real estate taxes for the land under the bridge (the railroad does).

FACTS

The plaintiffs in this case are C-B Realty and Trading Corpora-

tion, Harris Trust & Savings Bank, as trustee under trust agreement dated July 25, 1975, Julius Braun, Morris Braun, Eve Braun, joint venturers under the style of C-B Realty Joint Venture (collectively C-B Realty). The defendants are Chicago & North Western Railway Company and Chicago and North Western Transportation (collectively C&NW).

We issued an opinion concerning this case in *C-B Realty & Trading Corp. v. Chicago & North Western Ry. Co.*, 198 Ill. App. 3d 926, 556 N.E.2d 634 (1990). We found and now restate the following facts:

"In 1974, plaintiffs *** sued defendants *** for breach of two covenants in a 1908 contract pertaining to the payment of certain taxes and the maintenance of a railroad bridge.

In 1980, the trial court entered partial summary judgment in favor of plaintiffs by ruling that the two covenants ran with the land and that plaintiffs were entitled to enjoy the benefits conferred by the covenants.

In 1988, following a trial without a jury, concerning only damages and not liability, the court awarded plaintiffs $541,422.92, the full amount sought.

***

*** Defendant operates an elevated commuter service to a passenger depot in Chicago. Just north of the passenger station is a railroad bridge which passes over a portion of a former railroad freight warehouse. The warehouse extends in a semicircular manner eastward under the bridge, and then curves southward.

In 1908, defendant's predecessor in interest entered into a contract with the Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company, relating to the construction of that railroad bridge and the transfer of rights in certain property in Chicago.

In 1959, plaintiffs acquired title to the land upon which the freight warehouse rests, along with some adjoining property, as the successor to the interests of the Pittsburgh Company.

On September 20, 1974, plaintiffs filed this suit. Count I was withdrawn. Count II sought a judgment declaring that defendant was obligated to pay three-fourths of plaintiffs' taxes. The 1908 contract stated in paragraph 9 that defendant would pay three-fourths of taxes levied on the land now owned by plaintiffs:

'9. The North-Western Company [now defendant] will pay all taxes and assessments which may be levied against said overhead bridge or structure, and will also pay three-fourths of all taxes and assessments which may be levied against the tract of land owned by the Pittsburgh Company [now plaintiff], across which the said overhead structure is located.'

Count III of the complaint alleged that defendant had failed to maintain a watertight floor on its bridge and sought compensation for damage to the freight warehouse. The 1908 contract stated in paragraph 3 that defendant would maintain the bridge with a watertight floor over the freight house:

'3. The North-Western Company [now defendant] will construct, maintain and renew at all times the said bridge or structure so that the same shall have a water-tight floor construction over the entire area of the tracks and property of the Pittsburgh Company, and the North-Western Company at its own sole cost and expense, will reconstruct and rearrange the freight house of the Pittsburgh Company [now plaintiff] in accordance with said Exhibit A and under the direction of Chief Engineer of the Pittsburgh Company.'

Cross-motions for summary judgment were filed on the issue of whether paragraphs 3 and 9 were covenants running with the land. On December 19, 1980, Judge Murray entered an order in favor of plaintiffs, finding paragraphs 3 and 9 created covenants running with the land. The judge explained that the two paragraphs involved the enjoyment of the land, and such benefits and obligations passed with the ownership. On January 14, 1981, the judge modified the December 19 order by finding it was not final and appealable because other issues had yet to be decided.

On October 28, 1985, trial commenced before Judge Mackoff. The court limited the issues to plaintiffs' damages after finding that the December 19, 1980, entry of partial summary judgment determined all issues of liability. Following trial, by orders dated April 15 and July 6, 1988, Judge Mackoff entered judgment awarding plaintiffs the sum of $541,422.92." *C-B Realty & Trading Corp. v. Chicago & North Western Ry. Co.*, 198 Ill. App. 3d 926, 928-30, 556 N.E.2d 634 (1990). (End of 1990 opinion.)

We agreed with Judge Murray's ruling, but, for reasons that no longer matter, this court reversed the judgment entered in the first trial and ordered a new trial.

At the new trial, C-B Realty alleged, among other things, the same causes of action described in counts II and III of the 1974 complaint. At trial, C-B Realty asked $972,052 for property damage and $410,829.66 for back real estate taxes. C-B Realty sought punitive damages of $1,355,000.

The trial court found that C-B Realty's claim that C&NW had a duty to pay certain taxes under the 1908 contract was untimely filed. The trial court awarded C-B Realty $36,351 for the water damage to its building and for lost rent. The trial court did not award punitive damages. C-B Realty appeals. We reverse and remand in part and affirm in part.

OPINION

1. Real Estate Taxes

The 1908 contract contained the following provision:

"9. [The defendant] will pay all taxes and assessments which may be levied against said overhead bridge or structure, and will also pay three-fourths of all taxes and assessments which may be levied against the tract of land owned by [the plaintiff], across which the said overhead structure is located."

C-B Realty contended C&NW failed to honor this provision of the contract. C&NW filed a motion for summary judgment on this count, alleging C-B Realty's claim was untimely.

C-B Realty bought the property in 1959. It had leased it since 1939. The parties' dispute over C&NW's responsibility for three-fourths of the property taxes levied on the building arose in 1961.

C-B Realty first filed this lawsuit in September 1974. C&NW argued that its motion for summary judgment should be granted because C-B Realty did not file its lawsuit within 10 years after the dispute first arose. Without stating its reasons, the trial court granted C&NW's motion for summary judgment.

C-B Realty contends the trial court should not have granted C&NW's motion for summary judgment. It says that its claim was timely.

C-B Realty contends that the 20-year limitation that applies to the recovery of land should apply in this case. 735 ILCS 5/13—101 (West 1992). C-B Realty did not bring an action to recover land or to seek the right to enter onto land. It sought a declaratory judgment defining the terms of the 1908 contract. In its appellate brief, C-B Realty cites no case law suggesting that section 13—101 should apply in this case. This section does not apply.

■ This is not an action concerning the recovery of land. It concerns the interpretation of a contract. The statute of limitations in this case is 10 years. 735 ILCS 5/13—206 (West 1992).

In this case, the statute of limitations bars part of C-B Realty's claim. Both sides agree the tax dispute first arose in 1961. C-B Realty did not file suit until September 1974, 13 years later. C-B Realty cannot collect taxes that came due before September 1964.

C-B Realty argues that even if the statute of limitations had expired for the first tax years, it should be allowed to collect taxes that became due after 1964. It contends that C&NW's duty to pay taxes is similar to the duty to make installment payments. It claims that a new cause of action, with its own statute of limitations, arises every time a party fails to make an installment payment.

Obligations payable in installments run separate statutes of limitations against each installment at the time it becomes due. *Luminall Paints, Inc. v. La Salle National Bank*, 220 Ill. App. 3d 796, 802, 581 N.E.2d 191 (1991). See also *Light v. Light*, 12 Ill. 2d 502, 506, 147 N.E.2d 34 (1957); *In re Marriage of Kramer*, 253 Ill. App. 3d 923, 928, 625 N.E.2d 808 (1993); *Thread & Gage Co. v. Kucinski*, 116 Ill. App. 3d 178, 184, 451 N.E.2d 1292 (1983). "[B]ecause each breach of a continuous duty has its own accrual date, a plaintiff may sue on any breach which occurred within the limitation's period, even if earlier breaches occurred outside the limitation period. [Citations.]" *Hi-Lite Products Co. v. American Home Products Corp.*, 11 F.3d 1402, 1409 (7th Cir. 1993).

C-B Realty could not know what damages it would suffer in future years because of C&NW's refusal to pay taxes. "[T]he statute of limitations for all potential harm should not begin to run immediately upon the initial breach; the extent of future harm could vary or cease completely depending on the extent of the defendant's later wrongful conduct. 'Where the potentiality of future harm is not clear, … limitations should not run until damages become recoverably certain.' [Note, *Developments in the Law: Statutes of Limitations*, 63 Harv. L. Rev. 1177, 1206 (1950).]" *Skinner v. Shirley of Hollywood*, 723 F. Supp. 50, 54 (N.D. Ill. 1989).

■ C&NW contends the 1908 contract does not obligate it to pay real estate taxes at all. C&NW says that the 1908 contract never was intended to apply to locally assessed real estate taxes. It claims the 1908 contract addresses only railroad assessments and taxes. The parties who signed the contract contemplated that the property always would be owned by a railroad company and subject only to railroad taxes. The contract, says C&NW, was not supposed to apply to other kinds of taxes that might be levied on the property.

The 1908 contract provides that C&NW "will pay *** three-fourths of *all* taxes and assessments which may be levied against the tract of land owned by [the plaintiff], across which the said overhead structure is located." (Emphasis added.) The 1908 contract does not distinguish between local taxes and railroad taxes. We find that the 1908 contract obligated C&NW to pay real estate taxes. "All," we believe, means all.

Because C-B Realty has a clear right to enforce the tax provision, it did not have to file a suit establishing its contractual rights within 10 years after the dispute first arose. The fact that C-B Realty raised the issue by way of a declaratory judgment action does not alter our view. That would be placing mere form well above commonsense substance.

The real estate taxes were due at regular intervals, just like installment payments. This case is similar to *Luminall*. In *Luminall*, the defendant owed the plaintiff a share of certain rents when those rents became due. This court found, "each time [the defendant] receives excess rent from a lessee of the premises and fails to pay [the plaintiff] its share of those rents, [the plaintiff] may bring an action for breach of contract." *Luminall*, 220 Ill. App. 3d at 802. The plaintiff could recover only those rents that the defendant had failed to pay in the last 10 years. It could not collect earlier rents.

Just as the defendant in *Luminall* had a duty to pay the rents as they became due, C&NW had a duty to pay three-fourths of real estate taxes as they became due. Every time C&NW refused to pay the real estate taxes, a new cause of action arose. Each of those causes of action had its own statute of limitations period. None of the statutes of limitation for the real estate tax claims that arose after September 1964 ran by the time C-B Realty filed its suit in September 1974. It was error to grant C&NW's motion for summary judgment.

2. The Definition of "Watertight"

According to the 1908 contract, C&NW agreed:

"3. [The defendant] will construct, maintain and renew at all times the said bridge or structure so that the same shall have a *water-tight floor construction* over the entire area of the tracks and property of [the plaintiff], and [the defendant] at its own sole cost and expense, will reconstruct and rearrange the freight house of [the plaintiff.]" (Emphasis added.)

C&NW built a bridge over the roof of the plaintiff's building around 1911. Over the next 60 years, the building was used as an unheated warehouse.

During the time the plaintiffs occupied the building, a "pan and drainage" system was used to make the bridge watertight. The system used pans to collect dripping water and downspouts to funnel the water outside the building.

Between the time the bridge was built and 1970, the bridge occasionally leaked. On request, C&NW fixed the leaks. No one complained that the system to maintain watertightness was so inadequate that it breached the 1908 agreement.

Around 1970, C-B Realty began to complain about the pan and drain system. The bridge's leaks began to cause water damage to the building. The damage continued over the next 25 years.

Also around 1970, C-B Realty began to plan to convert the warehouse into offices. C-B Realty's plans were not compatible with the pan and drain system. C-B Realty wanted C&NW to remove the

pan and drain system and replace it with another type of waterproofing so that it could construct offices.

C&NW refused to replace the pan and drain system. C-B Realty sued.

This case was tried without a jury. The trial court found, as a matter of law, that the term "watertight" was ambiguous. When reaching this conclusion, the trial court considered the way the parties had interpreted the 1908 contract over six decades. The trial court held that the term "watertight" referred to a system only as watertight as could be achieved by a pan and drain system. It held that C&NW was not obligated to provide a "watertight" system compatible with C-B Realty's plans to convert the warehouse into offices.

The trial court held that it would have reached the same decision if the term "watertight" were not ambiguous. The trial court found that through the parties' course of dealing, C-B Realty had accepted the level of "watertightness" provided by the pan and drain system as it existed before 1970. It held that C-B Realty had waived the right to a completely watertight system. The trial court held C&NW was responsible for water damage caused when the pan and drain system failed, but only to the extent that C-B Realty could prove those damages. We agree.

■ "The primary objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract." *Zale Construction Co. v. Hoffman*, 145 Ill. App. 3d 235, 241, 494 N.E.2d 830 (1986). Whether a contract is ambiguous is a question of law. If no ambiguity exists, the intention of the parties must be determined from the instrument itself. *Farm Credit Bank v. Whitlock*, 144 Ill. 2d 440, 447, 581 N.E.2d 664 (1991); *Bonnie Owen Realty, Inc. v. Cincinnati Insurance Co.*, 283 Ill. App. 3d 812, 820, 670 N.E.2d 1182 (1996).

The term "watertight" is not intrinsically ambiguous. Neither the court nor the defendants explain how "watertight" has any meaning beyond its obvious definition. The term "watertight" is unambiguous.

C-B Realty argues the trial court incorrectly determined that it waived the right to have the "watertight" contractual provision strictly enforced. It claims it never waived the right to a watertight bridge.

■ For a party to waive a right, the facts must indicate that the party knowingly relinquished that right. The facts must show the party was aware of the right and of the defective condition. *Shaw v. Bridges-Gallagher, Inc.*, 174 Ill. App. 3d 680, 688, 528 N.E.2d 1349 (1988). Provisions of a contract may be waived by parol agreement.

*Beverly Bank v. Alsip Bank*, 106 Ill. App. 3d 1012, 1017, 436 N.E.2d 598 (1982). "[S]ilence, coupled with knowledge by one party and detrimental reliance by the other party, could result in an acceptance of a change in contract terms." *Martz v. MacMurray College*, 255 Ill. App. 3d 749, 753, 627 N.E.2d 1133 (1993).

This court has found that a party can waive a contract provision by failing to object to its breach. In *Bartels v. Denler*, 30 Ill. App. 3d 499, 333 N.E.2d 640 (1975), the defendants hired the plaintiff to work at a supermarket. The plaintiff's employment contract said the plaintiff could not "without the consent of [the defendants], directly or indirectly, *** be engaged in or concerned with any other duties or pursuits whatsoever during the term of this agreement." The contract said that the defendants would pay the plaintiff a yearly incentive bonus. *Bartels*, 30 Ill. App. 3d at 500.

During plaintiff's employment, plaintiff also worked at a drugstore. The plaintiff never informed the defendants of his other employment, but the defendants found out about it from other sources. The defendants did not terminate the contract at that time.

Six months after the defendants discovered the plaintiff's other employment, the defendants learned that the plaintiff had also gone into business for himself. The plaintiff had quit five days earlier, giving the 30-day notice mandated by the contract. Although the plaintiff had abided by the other terms of the contract, the defendants refused to pay the incentive bonus. The plaintiff sued.

The trial court found for the plaintiff. It found that the plaintiff had not started his business until after the employment contract term had ended. It held that the plaintiff's job at the drugstore did not affect its decision. It said, "[T]he Defendants waived any violation for reason of the Plaintiff being employed in a drug store *** as they learned of that employment and made no request of the Plaintiff that he terminate that employment." *Bartels*, 30 Ill. App. 3d at 501.

The appellate court agreed with this finding: "It is well established that a party to a contract may waive provisions contained in the contract for his benefit. (12 Ill. L. & Prac. *Contracts* § 408 (1955).) Although plaintiff's part-time job constituted a violation of the restrictive covenant, the defendants' conduct upon learning of such employment waived strict compliance with that provision of the contract." *Bartels*, 30 Ill. App. 3d at 501-02. See also *Jacobs v. Carroll*, 46 Ill. App. 3d 74, 83, 360 N.E.2d 136 (1977) (when party did not act on a breach of contract in 1972, it could not use that breach to avoid the contract in 1974).

■ This case is similar to *Bartels*. In this case, C&NW used a pan and drainage system to make the bridge watertight. For 30 years, de-

spite occasional leaks, C-B Realty never complained about the sufficiency of watertightness this system created. True, the parties meant for the bridge to be completely watertight when the 1908 contract was executed, and they meant it when C-B Realty bought the property in 1959. But C-B Realty waived the right to a completely watertight bridge by remaining silent until 1970.

The contract called for a watertight "floor." C-B Realty knew from the beginning the bridge did not have a watertight floor. Just as the defendants in *Bartels* accepted the plaintiff's extracurricular employment by remaining silent for over six months, C-B Realty accepted the pan and drain system by remaining silent for 11 years. By not complaining until 1970, C-B Realty has relinquished the right to require C&NW to make the bridge any more watertight than afforded by a maintained pan and drain system.

C-B Realty claims it was continuously injured and therefore anything it did years before should not have an effect on its right to file a suit later. Whether C-B Realty's claim was timely, however, is not an issue. That C-B Realty had a right to a separate cause of action every time the building suffered water damage does not affect the trial court's finding that C-B Realty's actions over three decades proved it accepted the pan and drain system.

■ C-B Realty alleges it proved greater damages than the trial court awarded. It requests that this court award it all of the damages it demanded.

Plaintiffs have the duty to establish that they sustained damages as well as a reasonable basis for computing those damages. We will not reverse a trial court's findings of damages unless those findings are against the manifest weight of the evidence. *City of Peoria Municipal Employees Ass'n v. City of Peoria*, 217 Ill. App. 3d 550, 555, 577 N.E.2d 819 (1991).

During trial, C-B Realty presented a great deal of evidence describing economic losses presumably caused by the pan and drain system. One major item of damage C-B Realty claimed was that, because of the pan and drain system, it was unable to convert the building into offices. In addition, it argued it could not rent the building as a heated or unheated warehouse. C-B Realty presented scant evidence showing how much it would cost to repair those parts of the building that suffered water damage.

The trial court held that C&NW was not required to install a waterproofing system compatible with remodeling the building for offices. It found: C&NW had done nothing to prevent C-B Realty from heating the warehouse; C-B Realty was entitled only to those damages it had proven; C-B Realty proved it spent $14,400 on emergency

repairs; and C-B Realty lost $21,951 in rent as an unheated warehouse because of the water damage. We find the trial court's damage award is not against the manifest weight of the evidence.

3. Punitive Damages

C-B Realty contends the trial court's decision not to award punitive damages should be reversed.

■ Generally, punitive damages are not recoverable for breach of contract, even if the breach was "wilful." Punitive damages are recoverable for a breach of contract only when "the conduct causing the breach is also a tort for which punitive damages are recoverable." *Morrow v. L.A. Goldschmidt Associates, Inc.*, 112 Ill. 2d 87, 95, 492 N.E.2d 181 (1986). The party seeking punitive damages must show the breaching party acted with malice, wantonness, or oppression. *Morrow v. L.A. Goldschmidt Associates, Inc.*, 112 Ill. 2d 87, 95, 492 N.E.2d 181 (1986).

■ The trial court held C&NW had not acted with malice. It found that C&NW had been cooperative about fixing the pan and drainage system in the past. C-B Realty disagrees with this finding, claiming that C&NW's actions were wilful and wanton.

C-B Realty apparently contends it should receive punitive damages merely because the breach of contract was wilful and wanton. Our supreme court has held that a wilful and wanton breach of contract is not sufficient to award punitive damages. "Simply characterizing a breach of contract as 'wilful and wanton' does not change the fact that plaintiffs are only seeking recovery for harm to a contract-like interest. We cannot agree that a breach of contract becomes a tort just because the breach was wilful and wanton." *Morrow*, 112 Ill. 2d at 98. C-B Realty never claimed that a separate tort warranting punitive damages occurred in this case. We affirm the trial court's refusal to award punitive damages.

## CONCLUSION

We reverse the trial court's order granting the defendants' motion for summary judgment on the real estate tax claim and remand for further proceedings consistent with this opinion. We affirm the trial court's award of $35,351 for damages caused by the leaking bridge. We affirm the trial court's decision not to award punitive damages.

Reversed and remanded in part; affirmed in part.

CERDA and BURKE, JJ., concur.